## S04P0328. LAMAR v. THE STATE.
(598 SE2d 488)

HUNSTEIN, Justice.

A jury convicted Cedric Treymaine Lamar of murder and related crimes in connection with the May 26, 1998 shooting death of Amir Gillani; the jury fixed Lamar's sentence for the murder conviction at death. Because we find that Lamar was denied his constitutional right to self-representation, we reverse Lamar's convictions and sentences. The State is authorized to retry Lamar and to again seek the death penalty.

*Reversible Errors*

1. Our review of the record reveals that although Lamar considered counsel's pretrial preparations to be adequate, he eventually grew dissatisfied with lead counsel's decisions regarding a defense strategy. Ten days before jury selection, Lamar's dissatisfaction with his lead counsel, Michael Mears, was brought to the trial court's attention by Mears and was then discussed ex parte. Lamar expressed to the trial court his frustration with counsel's alleged unwillingness to communicate with him and to consider his preferred approach to defending himself at trial. See *Colwell v. State*, 273 Ga. 634, 638 (3) (b) (544 SE2d 120) (2001) (addressing defendant's right to control basic approach to his defense). Lamar also stated that he believed his attorneys were "crooked." Lamar inquired into the possibility of obtaining a new attorney and into the possibility of representing himself with the aid of advisory counsel. The trial court indicated to Lamar that it was not inclined toward allowing Mears to withdraw as lead counsel, and Mears indicated to the trial court that

he would "continue trying to address [Lamar's] concerns and to accommodate [Lamar's] needs within the framework of [Mears's] responsibility as his attorney." Five days later and still five days before trial, Mears filed a motion styled as a "Motion for a Continuance," in which Mears communicated Lamar's "unequivocal" demand to represent himself but in which Mears also argued that the trial court should grant a continuance in order for a mental health expert to determine Lamar's competence to stand trial and to represent himself. The trial court ruled that Lamar was mentally competent, but, after a lengthy colloquy with Lamar, the trial court denied Lamar's request to represent himself. We find that the trial court erred by refusing to allow Lamar to represent himself at trial.

(a) It is impermissible as a matter of constitutional law for a mentally incompetent person to be subjected to trial, regardless of whether that person is tried while represented by counsel or while acting pro se. *Godinez v. Moran*, 509 U. S. 389 (113 SC 2680, 125 LE2d 321) (1993); *Colwell*, supra, 273 Ga. at 635 (2). The standard of mental competency to stand trial is the same as the standard of mental competency to waive the right to counsel. *Moran*, supra, 509 U. S. at 398 (II) (A). The prohibition against subjecting incompetent persons to trial often is enforced in Georgia pursuant to OCGA § 17-7-130 (a), which provides for a special jury trial on the question of competence "[w]henever a plea is filed that a defendant in a criminal case is mentally incompetent to stand trial." However, even when no such plea is entered, a trial court still bears the constitutional duty to inquire into a defendant's competency where it "appears to be in question at the time of trial." *Colwell*, supra, 273 Ga. at 635 (2); see *Pate v. Robinson*, 383 U. S. 375 (II) (86 SC 836, 15 LE2d 815) (1966).

In Lamar's case, no plea was made that he was mentally incompetent to stand trial.[1] Nevertheless, the trial court undertook its constitutional duty to inquire into Lamar's competency. In that regard the trial court, after noting the lack of a request for a competency trial, considered the results of a mental health examination that Lamar had very recently undergone that had shown Lamar to be mentally competent. Based on this information, together with its own observations of Lamar's pre-trial behavior, the trial court correctly found that competence was not a factor in deciding whether or not to allow Lamar to undertake his own representation. *Colwell*, supra, 273 Ga. at 637 (3) (b).

---

[1] Neither defense counsel nor the defendant himself sought a jury trial on his competence to stand trial; instead, counsel sought merely to have Lamar's competence determined by a mental health expert who would report to the trial court.

(b) Having correctly determined that Lamar's mental competence was not an obstacle to his self-representation, the trial court next sought to determine whether Lamar knowingly and intelligently waived his Federal and State constitutional rights to counsel. *Faretta v. California,* 422 U. S. 806 (V) (95 SC 2525, 45 LE2d 562) (1975); *Colwell,* supra, 273 Ga. at 637 (3) (b) (applying Federal constitution and Ga. Const. 1983, Art. I, Sec. I, Par. XII). Under *Faretta* the trial court must apprise the defendant of the "dangers and disadvantages" inherent in representing himself "so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Cit.]" Id. at 835 (V). See also *Harris v. State,* 269 Ga. 731 (2) (505 SE2d 467) (1998) and *Clarke v. Zant,* 247 Ga. 194, 196 (275 SE2d 49) (1981) (trial judge has "the serious and weighty responsibility" of determining whether defendant intelligently waived his right to counsel). However, upon being apprised by the trial court of those "dangers and disadvantages," a competent defendant who nevertheless chooses voluntarily to proceed pro se has validly waived the right to counsel under our Federal and State constitutions and is entitled to exercise his or her constitutional right to self-representation. *Faretta,* supra.

We recognize that the requisite colloquy between a trial court and any criminal defendant regarding the potential dangers and disadvantages of self-representation may be more involved and detailed in a death penalty case than in some other criminal cases in order for the trial court to fulfill this serious and weighty responsibility. The transcript in Lamar's case, however, reveals that the trial court did not undertake to inform Lamar of the dangers of self-representation. Instead, the trial court questioned Lamar about his legal knowledge of death penalty law, asking him, e.g., to "tell me some of the dangers you might run into if you represent yourself"; "what are [the] various defenses that you could have" to the charged crimes; to define "what the word mitigation means"; and whether Lamar would "know what the Witherspoon questions are to a potential juror." At the end of the colloquy the trial court observed that "death penalty cases stand on a different footing entirely. All standards are heightened, all bars are raised. . . . To waive the right [to counsel], you've got to know what you're facing and I can't say that Mr. Lamar really knows what he's facing based on what he's talked to me about today." The trial court then denied Lamar's request to proceed pro se.

The transcript thus reveals that the trial court erroneously failed to follow the procedure in *Faretta,* supra. The trial court did not try to make Lamar aware of the dangers and disadvantages he faced proceeding pro se at trial due to his ignorance of basic criminal law concepts; instead, the trial court queried Lamar in order to assess the

scope of Lamar's pre-existing knowledge of criminal law. Lamar's "technical legal knowledge" was irrelevant to "an assessment of his knowing exercise of the right to defend himself." *Faretta*, supra, 422 U. S. at 836 (V). "The test is not whether the accused is capable of good lawyering — but whether he [or she] knowingly and intelligently waives his [or her] right to counsel." *Wayne v. State*, 269 Ga. 36, 38 (2) (495 SE2d 34) (1998). Although the trial court specifically disclaimed that its decision was based on Lamar's lack of legal knowledge, the transcript reflects otherwise.

(c) Despite the trial court's failure to make Lamar aware of the dangers of self-representation, our review of Lamar's answers to the trial court's many questions reveals that he had a sound general knowledge of the charges against him and of the trial process; that he was able to grasp those other dangers and disadvantages of self-representation that were explained to him; that he appreciated the advantage counsel could provide; and that he clearly understood the ultimate danger of self-representation in his case.[2] The record clearly establishes that once Lamar concluded in his own view that his theory of defense would be presented as he preferred only if he proceeded pro se, Lamar chose knowingly and voluntarily to waive his right to counsel and unequivocally asserted his right to represent himself before the trial had begun. We accordingly reject the State's argument that Lamar vacillated in his request to proceed pro se.

The record thus reflects that Lamar both wished to make and was mentally competent to make a knowing and intelligent waiver of his right to counsel. We conclude that the trial court committed reversible error by refusing to allow Lamar to represent himself.

### Sufficiency of Evidence

2. We find that the evidence was sufficient to authorize a rational trier of fact to conclude beyond a reasonable doubt that Lamar was guilty on each charge and to find that at least one statutory aggravating circumstance existed. Accordingly, the State is authorized to retry Lamar on all charges and to again seek the death penalty. See *Childress v. State*, 266 Ga. 425 (6) (467 SE2d 865) (1996).

### Other Issues Likely to Arise Again on Retrial

3. Lamar argues, particularly with regard to potential juror Dillard, that the trial court denied him the right to ask jurors if they

---

[2] Lamar told the trial court, "I have no lack of understanding that if I lose this case I will receive the death penalty."

were conscientiously opposed to a life sentence with the possibility of parole and if they would be willing to consider imposing that sentence for murder. Since the time of Lamar's trial, we have held that a death penalty defendant must be permitted to make such inquiries of jurors. *Zellmer v. State,* 272 Ga. 735 (534 SE2d 802) (2000). Upon retrial, the trial court should ensure that voir dire is conducted in a manner consistent with our opinion in *Zellmer.*

4. As we have consistently held, "[q]ualifying potential jurors on the basis of their death penalty views is not unconstitutional. [Cit.]" *Braley v. State,* 276 Ga. 47, 52 (21) (572 SE2d 583) (2002).

5. While we perceive no reversible error in the trial court's refusal to order a change of venue for Lamar's first trial, the factual circumstances existing at the time of retrial should be considered if Lamar should again seek a change of venue. See *Gissendaner v. State,* 272 Ga. 704 (2) (532 SE2d 677) (2000).

6. Lamar argues that the seizure and subsequent search of his backpack was unconstitutional. Testimony presented at a pretrial hearing demonstrated that Lamar left the backpack on the floor of the bakery where he was employed and that the backpack was open to the view of employees and visitors. An FBI agent observed the backpack in plain view and was informed by the manager that the backpack belonged to Lamar. Lamar lacks standing to challenge the agent's mere presence in this open space that was subject to the control of the bakery's management; furthermore, it is clear from the record that the bakery manager gave his consent to the agent's presence. Because the agent was aware that a person identified by witnesses as being Lamar had been videotaped leaving the scene of the murder wearing a backpack, the agent had probable cause to seize the backpack as potential evidence of Lamar's presence at the murder scene. See *Moss v. State,* 275 Ga. 96, 104 (14) (561 SE2d 382) (2002) (addressing plain view doctrine); 3 LaFave, Search and Seizure, § 8.1 (c), pp. 623-625 (3d ed. 1996). Pretermitting whether the State improperly failed to carry its burden of proving that the agent's search of the backpack was legally permissible, but see id. at § 5.5 (c), pp. 199-200 (showing of probable cause to seize container in plain view does not alone demonstrate that warrant is not required to search contents of container); see also *O'Connor v. Ortega,* 480 U. S. 709, 716 (II) (107 SC 1492, 94 LE2d 714) (1987), the lack of any inculpatory contents in the backpack rendered any error in the admission of this evidence harmless beyond a reasonable doubt. See generally *Chapman v. California,* 386 U. S. 18 (III) (87 SC 824, 17 LE2d 705) (1967) (addressing harmless constitutional violations); *Mullins v. State,* 258 Ga. 734 (2) (374 SE2d 530) (1988) (finding Fourth Amendment violation harmless).

7. There is no merit to Lamar's argument that his arrest warrants were constitutionally invalid or otherwise unlawful. There was no constitutional requirement for an arrest warrant for Lamar's arrest at a soup kitchen that was open to the general public. Compare *Payton v. New York*, 445 U. S. 573, 583 (100 SC 1371, 63 LE2d 639) (1980) (arrest in a private residence). Assuming, arguendo, that Lamar's arrest in Alabama by multiple agencies including the Federal Bureau of Investigation was subject to the Georgia arrest warrant requirements, we note that the warrants issued in Georgia prior to Lamar's arrest complied fully with Georgia statutory requirements. See OCGA § 17-4-41; *Smith v. Stynchcombe*, 234 Ga. 780, 781 (218 SE2d 63) (1975) (contrasting constitutional requirements for lawful search warrant with requirements of OCGA § 17-4-41). Our holding here resolves adversely to Lamar his arguments regarding evidence he contends should have been suppressed because of his alleged illegal arrest.

8. The trial court correctly found that Lamar's personal effects seized at the time of his arrest were sufficiently relevant to the question of his sanity at the time of the offense to be admitted into evidence. See *Clark v. State*, 224 Ga. 311 (1) (161 SE2d 836) (1968) (evidence of defendant's actions before and after crime relevant to question of sanity).

9. Georgia's death penalty statutes are not unconstitutional. *Gissendaner*, supra, 272 Ga. at 716 (16).

10. Georgia's murder statute, OCGA § 16-5-1, is not unconstitutional for any of the reasons Lamar argues. *Rhode v. State*, 274 Ga. 377 (20) (552 SE2d 855) (2001); *Chester v. State*, 262 Ga. 85 (3) (414 SE2d 477) (1992).

11. The Unified Appeal Procedure serves to protect the rights of death penalty defendants and is not unconstitutional for any of the reasons Lamar argues. *Jackson v. State*, 270 Ga. 494 (10) (512 SE2d 241) (1999).

12. Lamar argues that the trial court erred by refusing his request that his jury not be sequestered. OCGA § 15-12-142 (a) states that a trial court "may" permit the dispersion of a jury "except in capital cases." This Court has stated that the statute "requires the jurors to be sequestered" in death penalty cases. *Willis v. State*, 243 Ga. 185, 188 (5) (253 SE2d 70) (1979). Even if, as this Court has previously held in other cases, the sequestration of death penalty jurors is not mandatory where the defendant gives his or her consent for the jury to be dispersed during trial, see, e.g., *Jones v. State*, 243 Ga. 820 (3) (256 SE2d 907) (1979), a trial court is clearly authorized by OCGA § 15-12-142 (a) to maintain jury sequestration over a death penalty defendant's objection. Because Lamar has not shown any

violation of his constitutional rights, the trial court did not err by sequestering the jury at Lamar's trial.

13. It would not have been improper for the trial court to emphasize in its original guilt/innocence phase charge that the jury could consider, in determining Lamar's mental state at the time of the crime, whether there had been any change in Lamar's mental state as a result of his taking new or additional medication since the time of the crime that may have made Lamar appear more mentally well at trial than he might have been at the time of the crime. See *Lawrence v. State*, 265 Ga. 310, 316 (3) (b) (454 SE2d 446) (1995). Nevertheless, we do not find that the trial court's failure here serves as a separate basis for reversal in light of the fact that the jury was aware through the trial testimony what medication Lamar was taking during trial and what effect that medication could have on his mental state. See id. at 316-317 (3) (b).

14. Although we need not address Lamar's arguments regarding the allegedly improper portions of the prosecutor's sentencing phase closing argument, we nevertheless note for the purposes of Lamar's retrial that juries in death penalty trials must be charged on the meaning of a life sentence with and without parole and the parties may present closing arguments regarding the appropriateness of such sentences in the case at hand. OCGA § 17-10-31.1 (d). See also *Zellmer*, supra, 272 Ga. at 735-736 (1).

15. The trial court did not exceed its discretion in permitting the State to replay the videotape of the murder during the sentencing phase. To hold otherwise would be inconsistent with this Court's prior decisions holding that evidence may be resubmitted, with proper instructions, during the sentencing phase upon the jury's request and that a videotape in evidence may be shown to the jury during closing arguments. See *Berryhill v. State*, 249 Ga. 442 (11) (291 SE2d 685) (1982) (replaying of testimony); *Brown v. State*, 268 Ga. 354 (8) (490 SE2d 75) (1997) (replaying portion of videotape during closing argument).

16. Lamar raises a vagueness challenge to OCGA § 17-7-130.1, which is part of the statutory scheme for handling insanity defenses in criminal cases and provides, inter alia, for the examination of the defendant by a court-appointed psychiatrist or psychologist.[3] Because the "fair warning" aspect of the void-for-vagueness doctrine is inapplicable here[4] and the statute sets forth sufficient guidelines to

---

[3] While some courts have found the void-for-vagueness doctrine inapplicable to criminal procedural statutes, e.g., *State v. Revels*, 585 NW2d 602 (Wisc. App. 1998), "[w]e are wary of attempting to draw such a bright line between substance and procedure and do not rely on such a distinction." *Armstrong v. Bertrand*, 336 F3d 620 (7th Cir. 2003).

[4] A statute may be void for vagueness because it fails to give people fair warning of what

avoid its arbitrary and discriminatory implementation, we find no merit in Lamar's argument. See *State of Ga. v. Old South Amusements*, 275 Ga. 274, 276 (564 SE2d 710) (2002) (legislature not required to draft statutes with mathematical precision); *Izzo v. State*, 257 Ga. 109 (1) (356 SE2d 204) (1987) (statute not void for vagueness if it provides enough specificity so as not to encourage arbitrary and discriminatory enforcement). Accord *Exxon Corp. v. Busbee*, 644 F2d 1030, 1033 (II) (5th Cir. 1981) (constitutionality of statute not concerned with either First Amendment or definition of criminal conduct should be leniently evaluated; "uncertainty in [a] statute is not enough for it to be unconstitutionally vague; rather, it must be substantially incomprehensible"). Finally, because OCGA § 17-7-130.1 does not require a defendant to cooperate with the court's expert and provides no sanctions against a defendant who refuses to so cooperate, *Motes v. State*, 256 Ga. 831, 832 (353 SE2d 348) (1987), there is no merit in Lamar's over-breadth argument. See also *Estelle v. Smith*, 451 U. S. 454 (II) (A) (101 SC 1866, 68 LE2d 359) (1981) (recognizing limited waiver of right to silence by defendant who introduces expert psychiatric testimony in support of insanity defense). See generally *Moody v. State*, 253 Ga. 456 (320 SE2d 545) (1984) (statute not overbroad that infringes upon no constitutionally-protected conduct).

*Judgment reversed. All the Justices concur.*

DECIDED JUNE 28, 2004.

*Michael Mears, Holly L. Geerdes*, for appellant.

*J. David McDade, District Attorney, Christopher R. Johnson, Assistant District Attorney, Thurbert E. Baker, Attorney General, Karen A. Johnson, Assistant Attorney General*, for appellee.

---

conduct is prohibited. *Bohannon v. State*, 269 Ga. 130 (3) (497 SE2d 552) (1998). See generally *Grayned v. Rockford*, 408 U. S. 104 (II) (A) (92 SC 2294, 33 LE2d 222) (1972).