S05P0906. LEWIS v. THE STATE.
(620 SE2d 778)

SEARS, Chief Justice.

Gerald Patrick Lewis murdered Peggy Grimes in Douglas County in 1993. In 2001, Lewis pled guilty to malice murder, felony murder,

feticide, aggravated battery, and kidnapping with bodily injury. After a 2003 sentencing trial, the jury recommended a death sentence for the malice murder conviction after it found three statutory aggravating circumstances: the murder of Peggy Grimes was committed by the defendant while he was engaged in the commission of an aggravated battery; the murder of Peggy Grimes was committed by the defendant while he was engaged in the commission of a kidnapping with bodily injury; and the murder of Peggy Grimes by the defendant was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, and an aggravated battery to the victim.[1] We affirm the death sentence.[2]

1. In the summer of 1993, the mother of 22-year-old Peggy Grimes reported her missing in Fulton County. Ms. Grimes was eight or nine months pregnant at the time. In September 1993, police in Douglas County discovered the skeletal remains of a woman believed to be in her mid-20's; they could not identify her so the remains were retained by the medical examiner. Lewis lived in Atlanta in 1993. In December 1993, he was incarcerated for theft by receiving, possession of car theft tools, possession of a knife during the commission of a crime, interference with government property, and driving under the influence. Upon his release in November 1997, he moved to Alabama.

On April 12, 1998, the police in Mobile, Alabama, responded to a murder in a seedy motel. The victim, Kathleen Bracken, had been strangled and stabbed. Witnesses provided descriptions of a man and a pickup truck at the motel that eventually pointed to Lewis. Lewis confessed to picking up Ms. Bracken, a prostitute, and murdering her. He was convicted of Ms. Bracken's murder and received life without parole. In another confession, Lewis admitted murdering another prostitute, Misty McGugin, in an Alabama motel room in January or February 1998 by strangling her with a rope and stabbing her with a knife. He wrapped her body in a tarp, carried it to her car, and dumped her body in the woods after having sex with it. After his confession, he

---

[1] OCGA § 17-10-30 (b) (2), (7).

[2] Lewis murdered Peggy Grimes in the summer of 1993. The Douglas County grand jury indicted Lewis on February 23, 2001, for malice murder, felony murder (two counts), feticide, aggravated battery, and kidnapping with bodily injury. The State filed its notice of intent to seek the death penalty on March 21, 2001. Lewis pled guilty to all the charges on November 19, 2001, and his sentencing trial took place from March 3 to March 27, 2003, when the jury recommended a death sentence for the malice murder conviction. In addition to the death sentence, the trial court sentenced Lewis to life imprisonment for feticide, 20 years for aggravated battery, and life without parole for kidnapping with bodily injury. The felony murder convictions are vacated by operation of law. Lewis filed a motion for new trial on April 10, 2003, and an amended motion for new trial on November 10, 2003. The trial court denied the amended motion for new trial on August 5, 2004. The case was docketed to this Court on February 16, 2005, and orally argued on June 13, 2005.

led the police to Ms. McGugin's remains. Lewis received a death sentence for this murder.

Lewis also confessed to murdering two women in Georgia. He stated that he picked up a prostitute in 1993 on Stewart Avenue in Atlanta because he "just wanted to kill her." He drove her to a dirt pit near Charlie Brown Airport, had sex with her at knife point, and then choked and stabbed her to death. Lewis tried to show the police where he had put the remains, but the area had changed since the murder, and they could not locate her. In 2002, the police found the skeletal remains of this victim only 50 yards from where they had been searching. She was never identified.

The second Georgia murder Lewis confessed to was the murder of Peggy Grimes. Lewis picked her up on Stewart Avenue in 1993; he could tell that she was pregnant. He drove her to Douglas County and parked near a bridge. He pulled a hunting knife, held it to her throat, and walked her into a kudzu patch. After she stripped naked, he straddled her chest, pinning her arms to the ground with his knees, and then choked her and stabbed her in the throat and chest. He also tried to cut open her stomach to remove the baby. After he left her body, he drove to his uncle's house and hid the knife in a hollow garage support beam. The medical examiner re-examined the remains recovered at that crime scene in 1993 and found fetal bones in the recovered dirt. He also found damage to a rib on Ms. Grimes's skeleton consistent with a knife cut. The Crime Lab was able to identify the remains as Peggy Grimes's from DNA supplied by her mother. The police recovered the blood-stained knife from where Lewis said he had hidden it.

Additional evidence showed that in 1987 Lewis strangled a five-year-old girl to unconsciousness in an elevator in his apartment complex. He spent five years in a mental hospital and a prison in Massachusetts for her attempted murder. After his release, he moved to the South. The State presented evidence of three more of Lewis's attacks on women, one in Georgia and two in or near Wal-Mart parking lots in Alabama, but they escaped his attempts to kidnap, rape, and murder them.

The evidence was sufficient to authorize the jury to find the statutory aggravating circumstances beyond a reasonable doubt.[3]

2. Lewis complains about the State's presentation of evidence of crimes other than those involving Peggy Grimes, but his argument is without merit. It is well-settled that in a sentencing trial the State may present evidence of a defendant's bad character, including

---

[3] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); OCGA § 17-10-35 (c) (2).

previous convictions and non-adjudicated offenses.[4] The non-statutory aggravating evidence presented by the State in the sentencing trial was therefore proper and admissible.[5] Lewis's complaint that the prosecutor argued in closing that the jury should not let Lewis "escape punishment" is also without merit. When viewed in context, the prosecutor was simply arguing that Lewis should receive the maximum penalty for the murder of Peggy Grimes. This argument, to which Lewis did not object, was not improper.[6]

3. Lewis claims that the trial court erred by restricting the questioning of prospective jurors during voir dire, but this claim is not supported by the record. Even though the parties had the benefit of pretrial juror questionnaires, the voir dire in this case lasted two weeks and consumed over 2,300 pages of transcript. The parties questioned more than 120 prospective jurors individually during voir dire and the trial court excused approximately 70 of them for cause or hardship. The trial court also did not prevent Lewis from determining if prospective jurors would be inclined to a particular sentence for "malice murder." The trial court, after noting the confusion of a prospective juror over the use of the term "malice murder," suggested that Lewis's counsel may want to refrain from using the legal term "malice murder" when the prospective jurors had not been instructed on its definition. At no time did the trial court make a ruling that Lewis could not use the term "malice murder" and Lewis was not restricted in his questioning of prospective jurors with regard to possible bias toward a particular sentence for a defendant convicted of murder. In addition, the trial court properly prevented the parties from asking questions that called for the prospective jurors' prejudgment of the case.[7] The voir dire was proper in this case because it was broad and thorough enough "to ascertain the fairness and impartiality of the prospective jurors."[8]

Lewis further complains that the trial court erred with some of its rulings on motions to excuse prospective jurors for cause.

---

[4] See *Pace v. State*, 271 Ga. 829, 842 (31) (524 SE2d 490) (1999); *Cook v. State*, 270 Ga. 820, 831 (15) (514 SE2d 657) (1999); *Jefferson v. State*, 256 Ga. 821, 825-828 (8) (353 SE2d 468) (1987); *Fair v. State*, 245 Ga. 868, 873-874 (4) (268 SE2d 316) (1980).

[5] See id.

[6] See *Carr v. State*, 267 Ga. 547, 558 (8) (b) (480 SE2d 583) (1997) ("The State's role in the sentencing phase is to convince a jury that a particular defendant deserves the harshest punishment."); *Walker v. State*, 254 Ga. 149, 159 (14) (327 SE2d 475) (1985) (prosecutor in penalty phase may vigorously urge that a death sentence is the appropriate punishment in the case at hand).

[7] See *Sallie v. State*, 276 Ga. 506, 509-510 (3) (578 SE2d 444) (2003); *Terrell v. State*, 276 Ga. 34, 37-38 (3) (572 SE2d 595) (2002).

[8] *Barnes v. State*, 269 Ga. 345, 351-352 (10) (496 SE2d 674) (1998).

(a) *Prospective jurors Clark, Johnson, Dyal, Osborne, Mitchell, Sellers, Bryant, Kehoe, Torstrick, Slay, and Carder.* Lewis claims that the trial court erred by denying his motions to excuse these prospective jurors for cause due to their alleged predisposition to the death penalty or alleged bias against life with parole or life without parole as possible sentences. "The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment 'is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "[9] As a general proposition, a prospective juror is not disqualified because he or she is leaning for or against a death sentence or another possible sentence,[10] but he or she is disqualified if possessed with an unwavering bias in favor of or against one of the possible sentences authorized by law, such that they could not meaningfully consider one of the three possible sentences as a verdict.[11] On appeal, our inquiry is whether the trial court's qualification or disqualification of the prospective juror is supported by the record as a whole.[12] An appellate court must pay deference to the finding of the trial court; this deference includes the trial court's resolution of any equivocations or conflicts in the prospective juror's responses on voir dire.[13] "Whether to strike a juror for cause is within the discretion of the trial court and the trial court's rulings are proper absent some manifest abuse of discretion."[14]

Our review of the record shows that Lewis did not move to excuse prospective juror Osborne for cause and the trial court did not err by failing to excuse her sua sponte.[15] In addition, this argument is moot with regard to prospective juror Slay because he was excused for medical reasons before jury selection.[16] The remaining prospective jurors expressed a leaning for or against a particular sentence for a convicted murderer but none of them were irrevocably committed to voting against one of the three possible sentences. Despite some equivocation, all of these prospective jurors indicated that they could meaningfully consider all three possible sentences. We conclude that

---

[9] *Greene v. State,* 268 Ga. 47, 48 (485 SE2d 741) (1997), quoting *Wainwright v. Witt,* 469 U. S. 412, 424 (II) (105 SC 844, 83 LE2d 841) (1985).

[10] *Mize v. State,* 269 Ga. 646, 652 (6) (d) (501 SE2d 219) (1998).

[11] See *Sallie,* 276 Ga. at 508; *Lance v. State,* 275 Ga. 11, 15 (8) (560 SE2d 663) (2002); *Rhode v. State,* 274 Ga. 377, 380 (6) (552 SE2d 855) (2001).

[12] *Greene,* 268 Ga. at 49.

[13] Id.

[14] Id. at 50.

[15] See *Mize,* 269 Ga. at 652 (6) (c).

[16] See *Lawler v. State,* 276 Ga. 229, 235 (5) (576 SE2d 841) (2003).

the trial court did not abuse its discretion by finding that they were qualified to serve on the jury.[17]

(b) *Prospective jurors Johnson and Cook.* Lewis claimed that these prospective jurors should have been excused for cause because they had interacted with police officers at their job or as a hobby. Prospective juror Johnson knew many Douglas County police officers through her employment at the municipal court but she stated that this would not affect her ability to be impartial. Prospective juror Cook was not a police officer but he had taken, at his wife's urging, a civilian-police training class in Douglas County. He said he knew only a few officers and had not yet gone on a ride-along in a police car. He also said that the class would have no effect on his consideration of the case. Considering the totality of their responses, the trial court did not abuse its discretion by concluding that neither of these prospective jurors was disqualified from serving on the jury.[18]

(c) *Prospective jurors Atwater, Baulding, and Bigby.* Lewis argues that the trial court erred by excusing these prospective jurors for cause due to their inability to consider a death sentence. Prospective juror Atwater wavered with virtually all of her answers on the death penalty. She was reluctant to answer questions about the death penalty and did not think she could vote for a death sentence. She also said that she would not want to look at the evidence supporting a death sentence. Prospective juror Baulding stated that he was opposed to the death penalty, would not consider it as a possible sentence, and would not wait to hear if the State had proved its case. Prospective juror Bigby was morally opposed to the death penalty and would never vote for a death sentence. The trial court did not abuse its discretion by excusing these three prospective jurors for cause.[19]

4. The trial court did not err by refusing to excuse prospective jurors for cause due to their exposure to pretrial publicity.[20] Voir dire revealed that some of the prospective jurors had heard about the case in the media but they could remember few details. Generally, what they could remember was accurate information that would be presented at trial, such as the fact that Lewis had pled guilty to

---

[17] See *Riley v. State*, 278 Ga. 677, 685-686 (6) (c) (604 SE2d 488) (2004); *Sealey v. State*, 277 Ga. 617, 619-620 (5) (593 SE2d 335) (2004); *Greene*, 268 Ga. at 48-50.

[18] See *Braley v. State*, 276 Ga. 47, 51 (15) (572 SE2d 583) (2002); *Cromartie v. State*, 270 Ga. 780, 784 (9) (c) (514 SE2d 205) (1999).

[19] See *Riley*, 278 Ga. at 685; *Braley*, 276 Ga. at 50-51 (11); *Greene*, 268 Ga. at 50-54. In addition, the death qualification of prospective jurors is not improper, nor is excusing a prospective juror for cause if the performance of their duties as a juror would be substantially impaired by their religious beliefs. *Riley*, 278 Ga. at 685 (6) (B); *Cromartie*, 270 Ga. at 785 (11).

[20] See *Heidler v. State*, 273 Ga. 54, 58 (4) (537 SE2d 44) (2000); *Cromartie*, 270 Ga. at 784 (9) (a).

murdering the victim. However, during the general voir dire of a panel of prospective jurors, a prospective juror blurted out that she had read that Lewis "kills redheads." Lewis moved to excuse the entire panel of prospective jurors over their exposure to the false "redheads" information.[21] Lewis also moved to excuse another panel of prospective jurors after one of them admitted overhearing a brief conversation about the case between prospective jurors on that panel in the jury room. The trial court denied the motions and we find no error. The trial court permitted the parties to individually question the relevant prospective jurors about the "redheads" remark and the jury room conversation, which only involved the fact that the victim had been pregnant. Except for the innocuous "redheads" remark, the information that the victim had been pregnant and that Lewis had killed was accurate information that would be presented at trial. None of the jurors indicated anything that they had heard during voir dire or in the media before trial would affect their ability to impartially decide the case. Lewis's trial was not affected by pretrial publicity as all the qualified jurors indicated that they could decide the case by only considering the evidence presented at trial.[22]

5. The trial court did not err by sequestering the jury. Lewis asked that the jury not be sequestered under OCGA § 15-12-142 (a), but the decision permitting this request in a capital case falls squarely within the trial court's discretion.[23] This Court has previously held that the trial court does not violate the statutory or constitutional rights of a capital defendant by refusing his request to not sequester the jury.[24] Lewis also failed to show how he was harmed by the jury's sequestration.

6. Lewis presented evidence of his mental health problems as mitigating evidence and he sought a jury charge on the effect his medication had on his demeanor.[25] During the trial, Lewis was on several drugs for the treatment of mental illness. He was concerned that the medication may make him appear more mentally well than he allegedly was at the time of the murder and that the side effects of the medication, such as drowsiness, may be interpreted by the jury as

---

[21] The prospective juror who made the "redheads" remark was excused on the motion of both parties. In addition to the comment at issue, she had a husband with emphysema, did not believe in swearing an oath, did not want to be on the jury, and did not think she could be fair.

[22] See *Heidler*, 273 Ga. at 58; *Cromartie*, 270 Ga. at 784.

[23] *Jones v. State*, 243 Ga. 820, 823-824 (3) (256 SE2d 907) (1979).

[24] See *Lamar v. State*, 278 Ga. 150, 155-156 (12) (598 SE2d 488) (2004).

[25] See *Lawrence v. State*, 265 Ga. 310, 316 (454 SE2d 446) (1995) (defendant entitled to a jury charge that his behavior in the jury's presence is conditioned by medication if insanity is an issue at trial).

disinterest or lack of remorse. Lewis claims that the trial court erred by denying his requested charge and inadequately charging the jury on this issue.

We find no error.[26] The trial court charged the jury that they were authorized to consider evidence "that the defendant is taking medication that may affect his demeanor and behavior in your presence." In addition, the jury was repeatedly informed by defense counsel and defense experts during the trial that Lewis was on medication for mental health problems and that this medication had affected his demeanor in the courtroom.[27]

7. The photographs of the crime scene and the skeletal remains of Peggy Grimes and the fetus were relevant and properly admitted.[28] Photographs which are relevant to an issue in the case are generally admissible even though they may be horrific.[29] The trial court also did not err by admitting a May 1993 sonogram picture of Peggy Grimes's fetus.[30]

8. Other than his claim regarding his requested charge on medication effects, Lewis listed his complaints about the jury charge in his appellate brief without specific argument or legal citation. Our review of the jury charge reveals no error.[31]

9. Lewis claims that the statutory aggravating circumstances alleged by the State to support a death sentence must be included in the indictment. This Court has recently addressed this specific issue and decided it adversely to Lewis's position.[32]

10. The Georgia death penalty statutes are not unconstitutional.[33] As required by *Ring v. Arizona*,[34] the jury found beyond a reasonable doubt the existence of the statutory aggravating circumstances necessary to impose a death sentence. There is no requirement that the jury find non-statutory aggravating circumstances beyond a reasonable doubt.[35] The non-statutory aggravating evidence presented by the State was reliable and admissible.[36]

---

[26] See *Lamar*, 278 Ga. at 156 (13).

[27] See id.

[28] See *Riley*, 278 Ga. at 686 (7); *Jackson v. State*, 270 Ga. 494, 498 (8) (512 SE2d 241) (1999).

[29] See id.

[30] See *Braley*, 276 Ga. at 54 (35).

[31] See id. at 56 (42).

[32] See *Riley*, 278 Ga. at 680 (2); *Terrell*, 276 Ga. at 40-42 (5).

[33] *Gregg v. Georgia*, 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976); *Braley*, 276 Ga. at 56 (43).

[34] 536 U. S. 584 (122 SC 2428, 153 LE2d 556) (2002).

[35] See *Wilson v. State*, 271 Ga. 811, 818 (10) (525 SE2d 339) (1999); *McClain v. State*, 267 Ga. 378, 387 (8) (477 SE2d 814) (1996); *Ross v. State*, 254 Ga. 22, 31 (5) (d) (326 SE2d 194) (1985), overruled on other grounds, *O'Kelley v. State*, 278 Ga. 564, 567 (2) (604 SE2d 509) (2004).

[36] See *Wilson*, 271 Ga. at 822-823 (20).

11. There was no error with regard to the admission of letters written by Lewis from jail to a police officer and the district attorney.[37]

12. Lewis claims that his death sentence should be vacated because he is mentally ill. Although there was no jury finding that he is mentally ill, there was evidence that he had been previously treated for mental illness and had been taking medications for mental illness at the time of his trial. Lewis argues that the ban on executing the mentally retarded should be extended to apply to the mentally ill because, like with mentally retarded murderers, the mentally ill have diminished culpability.[38] However, unlike a verdict of guilty but mentally retarded, the statute that provides for a verdict of guilty but mentally ill does not preclude a death sentence as the result of such a verdict.[39] Lewis also does not cite any authority that establishes a constitutional prohibition on convicting and sentencing to death a defendant who is competent but mentally ill, and we decline to extend the holdings of cases like *Atkins* that he cites as being analogous. Moreover, as previously mentioned, Lewis was not found to be guilty but mentally ill. During the sentencing trial, the jury heard evidence about his treatment for mental illness and his medications, as well as evidence that several psychologists had found him to be faking or exaggerating his symptoms of mental illness, and the jury decided that a death sentence was the proper verdict.[40] We decline to reverse the verdict on the grounds alleged by Lewis.

13. There was no error with the verdict form.

14. Lewis claims that the amount of money paid to jurors for their jury service is insufficient to enable wage earners and people with small children to serve on the jury. He alleges that this resulted in hardship excusals that altered the representative nature of the jury list. However, Lewis did not object to the excusal of any particular prospective juror for hardship reasons and the decision to excuse a potential juror for hardship reasons is left to the sound discretion of the trial court.[41] The record reveals that the trial court did not abuse this discretion.[42] Moreover, the hardship excusals could not have

---

[37] See *Alexander v. State*, 239 Ga. 108, 110 (236 SE2d 83) (1977) ("The admission of evidence is a matter which rests largely within the sound discretion of the trial judge.").

[38] See *Atkins v. Virginia*, 536 U. S. 304, 318-320 (122 SC 2242, 153 LE2d 335) (2002) (providing reasons for constitutional ban on executing the mentally retarded).

[39] See OCGA § 17-7-131.

[40] See *Bishop v. State*, 268 Ga. 286, 296 (20) (486 SE2d 887) (1997) ("It was for the jury to decide whether Bishop's mental health and history of alcohol and drug abuse were sufficiently mitigating so as to justify a life sentence.").

[41] See OCGA § 15-12-1 (a); *Sealey*, 277 Ga. at 620 (8); *McMichen v. State*, 265 Ga. 598, 612 (33) (a) (458 SE2d 833) (1995).

[42] See *Sealey*, 277 Ga. at 620; *McMichen*, 265 Ga. at 612.

affected the representative nature of the jury list and Lewis did not show that prospective jurors excused for hardship reasons are a cognizable group.[43]

15. From the beginning of the prosecution in Douglas County, Lewis wanted to plead guilty to his crimes there so he could be returned to the Alabama prison system. Although Lewis did not file a plea of mental incompetency,[44] the trial court required that Lewis be evaluated by a psychologist in order to determine his competence to plead guilty.[45] After this evaluation, the trial court held two hearings in 2001. Dr. Richards, the court-appointed psychologist, testified that he had read some previous mental health reports and twice met with the defendant. He concluded that Lewis suffered from no acute mental disorders, had average intelligence, and was competent to plead guilty or stand trial. In fact, Dr. Richards found Lewis to be very knowledgeable of legal terms and courtroom procedures. Two investigators presented a videotaped interview and numerous letters written by Lewis that further illustrated his competence. The defense presented jail records and previous psychological reports wherein it was noted that Lewis had been medicated and had malingered by attempting to "feign psychiatric disturbance." The ultimate conclusion of the previous psychologists was that Lewis was competent to stand trial. Although Lewis claims on appeal that he was not competent, we find no error with the competency hearing or the trial court's finding that he was competent to plead guilty.[46] Contrary to his claim on appeal, Lewis had access to a psychologist and did not request funds to hire his own mental health expert before the competency hearing so he was not denied expert assistance on the issue of competency.

16. Lewis made many confessions to the police in Alabama and Georgia that were properly admissible at his trial. The evidence showed that he had a tenth grade education, had obtained his GED, and had taken some college courses. His statements were not the result of any threats or promises. All the statements were voluntary and made after Lewis had been read his *Miranda* rights and waived them.[47] Even if Lewis is mentally ill as alleged, mental illness does not make a defendant incapable of making a voluntary statement.[48]

---

[43] See *Smith v. State*, 275 Ga. 715, 718 (2) (571 SE2d 740) (2002).

[44] OCGA § 17-7-130 (a).

[45] See *Lamar*, 278 Ga. at 151, n. 1.

[46] See *Adams v. State*, 275 Ga. 867, 867-868 (3) (572 SE2d 545) (2002); *Colwell v. State*, 273 Ga. 634, 635-636 (2) (544 SE2d 120) (2001); *Stripling v. State*, 261 Ga. 1, 2 (3) (401 SE2d 500) (1991).

[47] See *Lee v. State*, 270 Ga. 798, 800 (2) (514 SE2d 1) (1999); OCGA § 24-3-50.

[48] See *Morrow v. State*, 266 Ga. 3 (463 SE2d 472) (1995) (well-settled that a mentally ill

17. Execution by lethal injection is not unconstitutional.[49]

18. Lewis's death sentence was not imposed as the result of passion, prejudice, or any other arbitrary factor.[50] The death sentence is also not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant.[51]

Lewis kidnapped Peggy Grimes when she was visibly pregnant and murdered her by strangling and stabbing her. He also killed another Georgia woman and murdered two Alabama women in the same manner. He said in a statement that he always choked or strangled his victims first so they would not scream when he stabbed them. The evidence also showed that he tried to kill at least four other female victims, including a five-year-old girl. Considering the evidence, the cases listed in the Appendix support the imposition of the death penalty in that all involve a defendant who has murdered more than once, committed a murder during a kidnapping with bodily injury, or committed a murder involving the OCGA § 17-10-30 (b) (7) statutory aggravating circumstance.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Riley v. State*, 278 Ga. 677 (604 SE2d 488) (2004); *Franks v. State*, 278 Ga. 246 (599 SE2d 134) (2004); *Sealey v. State*, 277 Ga. 617 (593 SE2d 335) (2004); *Braley v. State*, 276 Ga. 47 (572 SE2d 583) (2002); *Lance v. State*, 275 Ga. 11 (560 SE2d 663) (2002); *Lucas v. State*, 274 Ga. 640 (555 SE2d 440) (2001); *Rhode v. State*, 274 Ga. 377 (552 SE2d 855) (2001); *Esposito v. State*, 273 Ga. 183 (538 SE2d 55) (2000); *Heidler v. State*, 273 Ga. 54 (537 SE2d 44) (2000); *Pace v. State*, 271 Ga. 829 (524 SE2d 490) (1999); *DeYoung v. State*, 268 Ga. 780 (493 SE2d 157) (1997); *Raulerson v. State*, 268 Ga. 623 (491 SE2d 791) (1997); *Gary v. State*, 260 Ga. 38 (389 SE2d 218) (1990); *Hicks v. State*, 256 Ga. 715 (352 SE2d 762) (1987); *Rivers v. State*, 250 Ga. 303 (298 SE2d 1) (1982); *Waters v. State*, 248 Ga. 355 (283 SE2d 238) (1981); *Hance v. State*, 245 Ga. 856 (268 SE2d 339) (1980).

DECIDED SEPTEMBER 19, 2005 —
RECONSIDERATION DENIED OCTOBER 24, 2005.

person can be competent to make a voluntary confession); *Johnson v. State*, 256 Ga. 259, 260 (4) (347 SE2d 584) (1986).

[49] *Riley*, 278 Ga. at 689 (15); *Dawson v. State*, 274 Ga. 327, 334-335 (554 SE2d 137) (2001).

[50] OCGA § 17-10-35 (c) (1).

[51] OCGA § 17-10-35 (c) (3).

*Michael Mears, Kenneth W. Krontz, Lindsay N. Bennett,* for appellant.

*J. David McDade, District Attorney, Christopher R. Johnson, Paul J. Miovas, Jr., Assistant District Attorneys, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Sabrina D. Graham, Assistant Attorney General,* for appellee.