**THIRD DIVISION**
**MILLER, P. J.,**
**RAY and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**March 27, 2013**

# In the Court of Appeals of Georgia

A12A2327. IRVING v. THE STATE.

RAY, Judge.

A Cobb County jury found Jovanda Nicole Irving guilty beyond a reasonable doubt of one count of aggravated assault,[1] three counts of cruelty to children in the first degree,[2] and two counts of aggravated battery.[3] She appeals from her convictions and the denial of her motion for new trial, contending that the trial court erred (1) in denying her motion for directed verdict; (2) in denying her motion to sever; (3) in failing to give a jury charge on accident; (4) in actively participating in the trial and conducting an ex parte hearing; (5) in admitting the child victim's out-of-court

---

[1] OCGA § 16-5-21.

[2] OCGA § 16-5-70 (b).

[3] OCGA § 16-5-24.

statement; (6) in denying her request to reopen the evidence; (7) in failing to excuse a juror for cause, and (8) in imposing an excessive sentence. Finding no error, we affirm.

1. Irving contends that she was entitled to a directed verdict of acquittal because the State failed to prove that the crimes occurred in Cobb County. We disagree.

> A motion for a directed verdict should be granted only when there is no conflict in the evidence and the evidence demands a verdict of acquittal as a matter of law. The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction: the evidence must be sufficient for a rational trier of fact to find beyond a reasonable doubt that the defendant was guilty of the charged offense. The evidence must be viewed in the light most favorable to support the verdict and the defendant no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine the credibility of witnesses.[4]

Viewed in this light, the evidence shows that Irving and her three-year-old daughter were living with Irving's boyfriend, Rudolph Nunnally, in apartment B-14

---

[4] (Citation omitted.) *Walker v. State*, 310 Ga. App. 223, 223 (1) (713 SE2d 413) (2011).

2

of the Skyway Apartments in Cobb County. On April 29, 2009, Barry Goodwin was standing outside of apartment B-13 with Maurice Promise when they heard the sound of a child screaming coming from inside Irving's apartment. Joseph Dunbar and Sherrod Gillis were barbecuing in the parking lot of the apartment complex when Promise got their attention and waived them over to listen. As they stood outside of Irving's apartment, the men heard the sound of a child being beaten. Goodwin testified that it sounded like "fists on flesh," and that what they heard "was rough . . . a little girl . . . screaming like, bad screaming, . . . can't really describe it, but it was bad." Goodwin further testified that the screaming was at first a "high pitch screaming, like a . . . horror movie scream," but after a minute the screaming "kept going down . . . , like if somebody . . . was trying to scream, but they really couldn't get it out." Dunbar testified that he heard "[a] lot of popping, just consistently pop, pop, pop, pop, pop," a "skin on skin" sound like someone was "popping the back of your hand consistently like twenty times." Dunbar further testified that he heard a child "sighing . . . , like an exhausted breathing" and another male and female saying "hold her, hold her" and "keep her still, keep her still." The beating went on for several minutes until Gillis called the apartment manager, Jimmy Gravley, who then called the police.

A Cobb County police officer, Brandon Williams, responded to the call and went to apartment B-14 to investigate. Irving allowed Officer Williams to come inside the apartment, and he observed the child sleeping face-down on the couch. Nunnally, Irving's boyfriend, was also inside the apartment at the time. Upon his examination of the child, Officer Williams observed marks across her upper back and marks on the back of her legs. When Officer Williams asked Irving how the child got these marks, Irving stated that the marks on the child's back were from "whippings from before," and that the marks on the child's legs were caused by the child "bump[ing] into things." Officer Williams asked Irving and Nunnally to remain in the apartment while he went outside to his patrol car to report his findings to the police department's Crimes Against Children Unit. After detectives were sent to the scene, Irving and Nunnally were placed under arrest, and the child was taken into protective custody.

The detectives observed fresh injuries on the child, which included areas without skin on her nose, lips, and buttocks. The detectives also observed "loop marks" on her body, bruising and open cuts on her head, and swelling on her stomach.

4

Thereafter, the child was taken to Scottish Rite Hospital. Dr. Stephen Messner examined the child and determined that she had various internal injuries and visible external injuries which were consistent with blunt force trauma. When Dr. Messner asked the child about her injuries, the child stated that her mother had hurt her with a belt and a stick. Dr. Messner determined that the "loop-shaped marks" on the child's body were consistent with being struck by a "looped-over object," such as "a cord or a belt or a rope," and that the linear bruising on the child's body was consistent with being struck with a linear object, such as a broom. As for the areas on the child's buttocks that were missing skin, Dr. Messner determined that these injuries were caused by repetitive trauma, and that the injuries were consistent with being struck repeatedly by a belt, a cord, or a paddle.

After executing a search warrant on Irving's apartment, the detectives found a belt hanging on a doorknob, several electrical cords, a paddle, and a broom with a broken handle. The detectives also found the child's bloody clothing, including underwear covered in blood, pus, and/or tissue.

In claiming that the trial court erred in denying her motion for a directed verdict, Irving contends that the evidence presented was insufficient because the State failed to prove that the injuries that the child sustained happened in Cobb County.

5

Irving argues that the evidence only shows that the child was crying in Irving's apartment.

> Generally, a criminal action must be tried in the county in which the crime was committed, and the State may establish venue by whatever means of proof are available to it, including direct and circumstantial evidence. As an appellate court, we view the evidence in a light most favorable to support the verdict and determine whether the evidence was sufficient to permit a rational trier of fact to find beyond a reasonable doubt that the crime was committed in the county where the defendant was indicted.[5]

In this case, the State presented the testimony of numerous witnesses and other evidence that sufficiently established that the crimes occurred in Cobb County. At trial, the testimony of Dunbar, Promise, Goodwin, and Gillis indicates that the men heard much more than just the sound of the child crying coming from Irving's Cobb County apartment. They heard the sounds of a child being severely beaten, along with male and female voices saying "hold her . . . keep her still" and "be still." Officer Williams testified that, when he arrived at the scene, he found Irving and Nunnally in the apartment with the child and that the child had visible marks on her body. Dr.

---

[5] (Citation and footnote omitted.) *Pippins v. State*, 263 Ga. App. 453, 455 (2) (588 SE2d 278) (2003).

Messner testified that he observed recent injuries to the child's body, including bruises, swelling, and damage to her internal organs from significant blunt force trauma. Further, the injuries that the child sustained were consistent with being struck by the items found in Irving's apartment.

Accordingly, we conclude that the State presented sufficient evidence to establish that the crimes occurred in Cobb County and for the jury to find beyond a reasonable doubt that Irving committed the crimes for which she was convicted. The trial court did not err in denying Irving's motion for a directed verdict of acquittal.[6]

2. Irving contends that the trial court erred in denying her motion to sever her trial from that of Nunnally, her co-defendant. Irving appears to argue that Nunnally's conduct[7] and decision not to testify at trial prevented her from eliciting testimony from Nunnally that would have exculpated her. However, Irving has failed to cite to any authority to support her argument that she was entitled to severance based on Nunnally's conduct, and she has failed to provide citations to the record to show that

---

[6] Id. at 455-456 (2).

[7] In her brief, Irving specifically refers to an outburst that Nunnally made to the trial court, prior to the start of trial, in which he railed against the case against him and the judicial system in general. However, this outburst was made *after* Irving had renewed her motion to sever.

Nunnally's testimony would have tended to exculpate her. Accordingly, Irving's argument in this enumeration is deemed abandoned pursuant to Court of Appeals Rule 25 (c) (2).

3. Irving contends that the trial court erred in denying her request to charge the jury on accident. We disagree.

"A charge on the affirmative defense of accident is required only if there is evidence to support a finding that the defendant committed the acts which were the basis of the charge, but without any criminal scheme or undertaking, intention, or criminal negligence."[8] Thus, the evidence must show that Irving admits to having committed the acts that would constitute the crimes for which she was charged, but claims that her acts were done unintentionally.[9]

Here, Irving's defense was that she did not cause the child's injuries. She argued that "this child was in the care and custody of Mr. Nunnally, that he snaps and

[8] (Citation and punctuation omitted.) *Griffin v. State*, 262 Ga. App. 87, 88 (3) (585 SE2d 145) (2003).

[9] *Haynes v. State*, 281 Ga. App. 81, 82 (2) (b) (635 SE2d 370) (2006). See also *Maxey v. State*, 272 Ga. App. 800, 802 (1) (613 SE2d 236) (2005) ("In order to assert a statutory affirmative defense, . . . the defendant must admit all of the elements of the crime except intent . . .").

he beat and injured this child." Irving, therefore, did not present an affirmative defense of accident.

Irving refers to the testimony of Officer Williams when he stated that, in response to his inquiry regarding the child's marks on her legs, Irving and Nunnally both stated that the child "bumps into things." However, this testimony does not warrant a charge on accident, because Irving did not admit in this statement that she committed any act against the child. Moreover, the evidence shows that the child's injuries were not consistent with her having bumped into things, but were consistent with being struck with a looped object, such as the belt or cord. As the evidence does not support a charge on accident, the trial court did not err in denying the request.

4. Irving contends that the trial court erred by actively participating in the trial and conducting an ex parte hearing concerning the mental health of Irving's co-defendant. We discern no error.

> Embodied within the constitutional rights to the courts is a criminal defendant's right to be present and see and hear, all the proceedings which are had against him on the trial before the [c]ourt. This is a fundamental right and a foundational aspect of due process of law.[10]

---

[10] (Citations and punctuation omitted.) *Ward v. State*, 288 Ga. 641, 645 (4) (706 SE2d 430) (2011).

9

In response to a motion filed by Irving's co-defendant immediately preceeding the start of the trial, the trial court requested that a mental health expert appear to give testimony regarding Nunnally's mental condition and his competency to stand trial. With Irving and her counsel present in the courtroom, Nunnally's counsel asked that the hearing be conducted outside the presence of the prosecution, the public, and all non-essential court personnel. The trial court granted the request, and it directed all persons to exit the courtroom. Irving did not object, and she was escorted to a holding cell until the conclusion of the hearing.

Although a defendant has a fundamental right to be present at all proceedings which are conducted at her trial, "the right to be present belongs to the defendant, and [she] is free to relinquish it if [she] so chooses."[11] The right is waived "if the defendant personally waives it in court; if counsel waives it at the defendant's express direction; if counsel waives it in open court while the defendant is present; or if counsel waives it and the defendant subsequently acquiesces in the waiver."[12] Here, the record shows that Irving and her counsel were present in the courtroom when the

---

[11] (Footnote omitted.) *Hampton v. State*, 282 Ga. 490, 492 (2) (a) (651 SE2d 698) (2007).

[12] (Footnote omitted.) Id.

10

trial court granted Nunnally's request for an ex parte hearing regarding Nunnally's competency to stand trial, and neither Irving nor her counsel objected to her leaving the courtroom. Thus, at the very least, Irving acquiesced in her counsel's waiver of her right to be present at this hearing.[13] Accordingly, the trial court's ex parte hearing does not warrant reversal of Irving's convictions.[14]

We also find no merit in Irving's argument that the trial erred in calling the mental health representative to the stand and questioning this witness concerning the status of Nunnally's mental health. The trial court has a constitutional duty to inquire into a defendant's competency when the issue "appears to be in question at the time of trial."[15] Furthermore, it is not improper for the trial court to question a witness "for the purpose of developing fully the truth of the case, and the extent of such an

---

[13] See *Hampton*, supra (holding that trial court's interviews of two jurors without defendant present did not violate defendant's right to be present at all critical proceedings because, in part, defendant acquiesced in his counsel's waiver of the right).

[14] See *Adams v. State*, 316 Ga. App. 1, 5-6 (2) (728 SE2d 260) (2012).

[15] (Citation and punctuation omitted.) *Lamar v. State*, 278 Ga. 150, 151 (1) (a) (598 SE2d 488) (2004).

11

examination is a matter for the trial court's discretion."[16] However, the trial court, in questioning the witness, cannot intimate any opinion or become argumentative.[17] As the record indicates that the trial court's examination into Nunnally's competency was in accordance with these principles, we discern no error.

Nor did the trial court err in suggesting to Nunnally's counsel that Nunnally be examined by a doctor, who happened to be present in the courthouse at the time. The trial court's suggestion was made in response to Nunnally's motion for such an evaluation, and Irving has failed to show how this was improper.

5. Irving contends that the trial court erred in admitting the child's out-of-court statement that she made to Dr. Messner during her medical examination, wherein she stated that "Mommy hurt me . . . with a belt" and "with a stick." We discern no error.

OCGA § 24-3-16[18] provides that

[a] statement made by a child under the age of 14 years describing any act of sexual contact or physical abuse performed with or on the child

---

[16] (Citation omitted.) *Mullins v. State*, 269 Ga. 157, 158 (3) (496 SE2d 252) (1998).

[17] Id.

[18] This Code section, which was in effect at the time of Irving's trial, has been repealed by Laws 2011, Act 52, § 2, effective January 1, 2013.

12

by another or performed with or on another in the presence of the child is admissible in evidence by the testimony of the person or persons to whom made if the child is available to testify in the proceedings and the court finds that the circumstances of the statement provide sufficient indicia of reliability.

In *Gregg v. State*,[19] we outlined a number of factors that the trial court may consider when determining the reliability of a child's out-of-court statement. These factors include, but are not limited to, (1) the atmosphere and circumstances under which the statement was made; (2) the child's condition (physical or emotional) at the time of the statement; and (3) the presence or absence of drugs or alcohol. "These factors are to be applied neither in mechanical nor mathematical fashion, but in that manner best calculated to facilitate determination of the existence or absence of the requisite degree of trustworthiness."[20]

The trial court conducted a hearing, outside the presence of the jury, regarding the admissibility of the child's statement. The record shows that, at the time the child made the statement, she was at the Scottish Rite Hospital being examined and treated for significant injuries. Dr. Messner testified that morphine and Tylenol had been

---

[19] 201 Ga. App. 238, 240 (3) (b) (411 SE2d 65) (1991).

[20] Id.

13

ordered for the child, but that he did not know if she had received these medications at the time he spoke to the child. He also testified that he did not recall if anyone else was present at the time the child made the statement, but that his report did not note that anyone else was present. The trial court found that the statement had sufficient indicia of reliability and allowed the statement to be introduced into evidence.

"The trial court has broad discretion in the admission of evidence, . . . and as long as sufficient evidence of indicia of reliability appears in the record *either before or after* the introduction of the child's out-of-court statements, the fair trial rights of the defendant are adequately protected."[21] Thus, if the record *as a whole* contains sufficient evidence that the child's out-of-court of statement has "indicia of reliability," we will not reverse the correct ruling of the trial court.[22]

In her statement, the child specified that she was struck with a belt and a stick, which is consistent with the injuries she received. Furthermore, her statement that her mother hurt her is supported by the testimony of the witnesses who heard the incident. For these reasons, we find that the statement has sufficient indicia of reliability and that the trial court did not abuse its discretion in admitting the statement.

---

[21] (Emphasis supplied.) Id. at 240 (3) (a).

[22] Id.

6. Irving contends that the trial court erred in denying her request to reopen the case to allow her to introduce statements that Nunnally had previously made to the trial court regarding their respective involvement in the incident. We disagree.

Whether to reopen the case after the close of the evidence rests within the sound discretion of the trial court, and a trial court's ruling in this regard will only be reversed if, in the totality of the circumstances, the record on appeal demonstrates that the trial court abused its discretion. [23]

Prior to the State resting its case, the trial court inquired into whether Nunnally was going to testify in his own defense. Outside the presence of the jury, the trial court advised Nunnally about his right to remain silent and his choices regarding testifying. Nunnally indicated that he wanted to make a statement, but that he did not want to testify. The trial court advised Nunnally that he could not make a statement, at this point, without being placed under oath and subjecting himself to cross-examination. Nunnally then reaffirmed that he did not want to testify. Nunnally then stated, "I just want to say that [Irving] didn't do this." Whereupon the following colloquy took place:

---

[23] *Smith v. State*, 306 Ga. App. 693, 696-697 (2) (703 SE2d 329) (2010).

15

MR. JONES [Irving's attorney]: Well, normally, and I think ethically, knowing in advance that [Nunnally] invoked his right, normally I would not call him [as a witness] knowing that. But I'm put in a very uncomfortable position here . . . I've heard him twice say that he wants to tell that he did it; that [Irving] is not responsible.

DEFENDANT NUNNALLY: I didn't say that.

MR. JONES: Well –

DEFENDANT NUNNALLY: I didn't say that I'm going to tell them that I did it. I didn't say that. . .

THE COURT: He's indicated just now that . . . he would invoke his right against self-incrimination and refuse to answer any questions that may tend to incriminate him regarding the offense for which he and Ms. Irving are on trial for. . .

MR. JONES: Well, he's invoking his right on one aspect. It's my understanding of the law that any other testimony would be stricken or disregarded . . . , he can't just exercise his Fifth Amendment privilege on a portion.

THE COURT: No . . . It's either an all or nothing.

MR. JONES: Right, and so it's my understanding now that he's invoked that formally; and therefore, out of the presence of the jury . . . that puts him on notice that I would attempt to call him. But now that I understand that he's invoked it, I will not be doing that in the jury's presence.

Thereafter, Irving did not attempt to introduce Nunnally's statements when she presented her case to the jury. On the morning after the close of evidence, Irving moved to reopen the case to introduce Nunnally's statements as admissions in judicio. The trial court denied the request, finding that the statements were not made under

16

oath and that reading the statements from the record to the jury would deprive the State of its right to cross-examination.

Considering the overwhelming evidence of Irving's guilt, together with Nunnally's recanting of his unsworn statements, it appears highly improbable that the statements would have led to a different verdict. Under these circumstances, we cannot conclude that the trial court abused its discretion in denying the motion to reopen the case.[24]

7. Irving contends that the trial court erred in denying a request to excuse a prospective juror for cause. As the record shows that the request for excusal was made by Nunnally, and that Irving did not join in this request, Irving has waived this issue and may not utilize it for the purposes of appellate review.[25]

8. In her last enumeration of error, Irving contends that her forty-year sentence was excessive and contrary to the principles of fairness. We discern no error.

---

[24] See *Carruth v. State*, 267 Ga. 221 (476 SE2d 739) (1996); *Hall v. State*, 309 Ga. App. 222, 226 (3) (709 SE2d 910) (2011).

[25] See *Maxwell v. State*, 267 Ga. App. 227, 229 (3) (599 SE2d 228) (2004) (defendant waived any objection by failing to adopt his co-defendant's objection). Compare *Underwood v. State*, 283 Ga. App. 638, 638-639 (1) (642 SE2d 324) (2007) (where defendant joined in the co-defendant's motion to excuse a juror for cause, the defendant preserved the issue for appellate review).

OCGA § 17–10–1 (a) (1) "authorizes the trial court to sentence a defendant to any amount of time within the limits provided by law."[26] Here, Irving's sentence falls within the statutory ranges for each offense. The Supreme Court of Georgia has held that

> Legislative enactments constitute the clearest and most objective evidence of how contemporary society views a particular punishment. As a result, the issue of punishment is generally one for the legislative branch, and legislative discretion is deferred to unless the sentence imposed shocks the conscience.[27]

Given the facts of this case, Irving's sentence was appropriate and was not so disproportionate as to shock the conscience.[28] Arguably, indeed, it was not disproportionate at all.

*Judgment affirmed. Branch, J., concurs and Miller, P. J., concurs in judgment only.*

---

[26] (Citation omitted.) *Baldwin v. State*, 217 Ga. App. 866, 868 (3) (460 SE2d 80) (1995).

[27] (Citation omitted.) *Widner v. State*, 280 Ga. 675, 676 (1) (631 SE2d 675) (2006).

[28] Id.