## A11A0057. WALKER v. THE STATE.

(713 SE2d 413)

ELLINGTON, Chief Judge.

A Houston County jury found John O. Walker guilty beyond a reasonable doubt of armed robbery, OCGA § 16-8-41 (a); hijacking a motor vehicle, OCGA § 16-5-44.1 (b); and kidnapping, OCGA § 16-5-40 (a). He appeals from the denial of his motions for new trial, contending that the trial court erred in denying his motion to quash the indictment, in denying his motion to sever, and in admitting similar transaction evidence. He also argues that the evidence was insufficient to support his convictions. Finding no error, we affirm.

1. Walker contends that he was entitled to a directed verdict of acquittal because the only evidence identifying him as the perpetrator of the charged crimes was the uncorroborated testimony of an unindicted co-conspirator. He also claims that the evidence that implicated him was purely circumstantial and that the State failed to exclude all other theories supported by the evidence except for his guilt.

> A motion for a directed verdict should be granted only when there is no conflict in the evidence and the evidence demands a verdict of acquittal as a matter of law. The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction: the evidence must be sufficient for a rational trier of fact to find beyond a reasonable doubt that the defendant was guilty of the charged offense. The evidence must be viewed in the light most favorable to support the verdict and the defendant no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine the credibility of witnesses.

(Footnotes omitted.) *Hughes v. State*, 297 Ga. App. 217 (676 SE2d 852) (2009). Viewed in this light, the record reveals the following facts.

In late August 1997, Walker and two friends, Roderick Hope and

Hope's cousin, Charles Brown, Jr., discussed taking a trip to Detroit, Michigan, so that Walker, who previously lived in Michigan, could meet with an attorney and pick up a check for proceeds arising out of the settlement of a legal matter. Because the men needed a vehicle for the trip, Hope and Brown cut a chain link fence surrounding a Worth County car dealership that night and stole a Buick Park Avenue.[1] Walker, his girlfriend, and their infant daughter then met Hope and Brown at the home of Hope's parents, as previously planned, and they all traveled to Michigan in the stolen Buick. They arrived in the Detroit area at approximately 7:00 p.m. on Friday, August 29, which was the day before the Labor Day weekend. Because they believed that the attorney's office would be closed until Tuesday, September 2, and because they needed money so that they could stay in Detroit over the weekend, the three men worked together to commit an armed robbery and a purse snatching. The men then used the money and credit cards that they obtained in the crimes to get additional cash and to pay for hotel rooms, food, and gas, and Walker used a credit card to buy two BB guns that resembled handguns and a television, which he later returned for a cash refund.

On Tuesday, the men discovered that Walker's attorney had closed her office and had moved out of state, so that Walker was unable to pick up the settlement check. Not wanting to return to Georgia "empty handed," the men began a multi-state crime spree that included automobile thefts, carjackings, and armed robberies. Specifically, while still in Michigan, Walker and Brown, posing as father and son, went to a car dealership shortly before closing time. Walker told the salesperson that he wanted to buy his "son" a car, asked to test drive a new Mercury Mountaineer, and allowed the salesperson to copy his driver's license. Shortly after Walker and Brown left the dealership in the Mountaineer, they removed the dealership's tag and replaced it with a stolen Virginia tag. They never returned the vehicle to the dealership. Walker and Hope then disposed of the stolen Buick (in which they had traveled to Michigan) by parking it behind a grocery store, pouring gasoline on it, and setting it on fire.

Next, Walker and Brown used the handguns to rob a couple as they were exiting a liquor store. Shortly thereafter, while Walker drove around the area in the Mountaineer, Hope and Brown used the handguns to rob and kidnap a woman and steal her Ford Explorer. When the woman's grandmother, who was in a separate car, tried to

---

[1] See Division 4, infra, regarding the admissibility of similar transaction evidence in this case.

intervene in the carjacking, Walker used the Mountaineer to block her car. Hope, who was driving the Explorer with Brown in the back seat, drove a short way before letting the woman out of the car. Walker followed the Explorer in the Mountaineer, with his girlfriend and their baby as passengers.

Before they left Michigan, Walker, Hope and Brown decided to steal another car on the trip back to Georgia. In Tennessee, Walker and Brown, again posing as father and son, went to a Nissan dealership. Accompanied by a salesperson in the front passenger seat, Walker "test drove" a Nissan Pathfinder while Brown sat in the back seat. During the drive, Brown pointed one of the handguns at the back of the salesperson's head, and Walker told the salesperson that they were hijacking the vehicle. After threatening the salesperson, Walker took a ring and approximately $200 in cash from the salesperson; Walker put the ring on his finger. Walker then stopped for gas, bought the salesperson a beer, and a few minutes later, left the salesperson on the side of the road before driving away.

The group arrived in Georgia on Wednesday, September 3; Walker was driving the Mountaineer with his girlfriend and their daughter as passengers, Hope was driving the Pathfinder, and Brown was driving the Explorer. In North Georgia, the men purchased two pairs of gloves. The next day, the men met at the house of an aunt of Hope and Brown in Worth County and discussed a plan to commit another robbery in order to get money to repaint and change the serial numbers of the three vehicles that they had stolen.

On the morning of Thursday, September 4, Walker, Hope and Brown went to Perry, Georgia, in the Mountaineer. In Perry, the men stopped at a grocery store after seeing an elderly man get out of a Cadillac Eldorado in front of the store. While Hope waited in the Mountaineer, Walker and Brown, who were wearing gloves and carrying the handguns, approached the elderly man as he left the store and returned to his Cadillac. While Walker got into the back seat of the Cadillac, Brown stood on the driver's side, pointed a handgun at the man, and ordered him to get inside the car. The man refused, so Brown climbed into the driver's seat and started to drive away. At that point, Brown realized that there was an elderly woman sitting in the front passenger seat. Even so, Brown drove the Cadillac at a high speed out of the store's parking lot; Hope followed him in the Mountaineer.[2] Immediately thereafter, the elderly man ran into the store and called the police. Police officers arrived at the store a

---

[2] Although some witnesses told police officers that they thought the Mountaineer was a Ford Explorer, the State established at trial that the two vehicles are very similar in appearance and could have been mistaken for one another.

minute later, and, based upon descriptions by eyewitnesses to the carjacking, issued a "BOLO" (be on the lookout) alert for a maroon Cadillac Eldorado occupied by two black males and one elderly white female.

In the meantime, Walker told Brown to speed up and to drive toward the interstate because the police were "on [their] trail." Walker warned the elderly woman to keep her mouth shut, poked her in the head with a handgun, asked her how much money she had in the bank, and warned her that, if she lied, he was going to kill her. The woman said she had $500, and Walker ordered her to write out a check for that amount. He also forced her to give him her ATM card, her PIN, and her jewelry, including a thick gold necklace and four rings. Then, Walker ordered Brown to exit the interstate and, seeing that they were being chased by police officers, told Brown to speed up. As Brown drove the Cadillac at speeds of approximately 80 mph, Walker climbed out of the back passenger seat window and, after being dragged for a moment, dropped onto the pavement, rolling several times. Brown then drove the Cadillac into a ditch, jumped from the car, threw his gloves and handgun into the bushes, and ran into nearby woods, where he was apprehended within two hours. The elderly woman identified Brown as the driver a short time after he was apprehended; the woman was unable to describe Walker to the police or at trial, however, other than to say that he was wearing gloves and was holding a handgun.

Walker was seriously injured when he hit the pavement, but he managed to limp to a nearby gas station. He approached a man near the gas pumps and asked him for a ride to the hospital, explaining that he had been hit by a car on the interstate. The man, who described Walker as "covered from head to toe with blood," wearing no shoes or shirt, but wearing a thick gold necklace, told him that he needed an ambulance and walked into the gas station to call for help. Walker then hobbled across the road toward a dumpster near an Exxon station. Police officers arrived less than a minute later, and they used a tracking dog to follow Walker's scent; they found him lying in a bushy area beneath a tree about a mile from the area where he had jumped out of the Cadillac. Walker was barefoot and covered in blood. He was transported to a hospital and, when he arrived, he was wearing the ring that he had stolen from the Nissan salesperson in Tennessee.

The next morning, officers found the elderly woman's necklace and rings hidden under a few inches of dirt near where Walker had been apprehended. Officers also found a glove, a right Duxbac-brand sandal, and one of the handguns along the road in the area where Walker had hit the pavement. In addition, Brown helped officers recover the handgun he had thrown when he ran from the Cadillac.

Finally, officers found a glove and a left Duxbac sandal inside the Cadillac.

Meanwhile, in the period between the Perry carjacking and Walker's arrest, Hope, who was driving the Mountaineer, became separated from Brown and Walker on the interstate. He eventually ditched the Mountaineer in a rural area, then stole a pickup truck from a gas company and drove to his aunt's house, where he was arrested the next day. Hope led police officers to the abandoned Mountaineer. Inside the Mountaineer, officers found a prescription bottle belonging to Walker's infant daughter and a key to a Nissan vehicle.

Walker and Hope were indicted in Houston County for armed robbery, hijacking a motor vehicle, kidnapping, aggravated assault, and theft by receiving stolen property. Although Brown was also charged with the crimes, he entered a negotiated guilty plea and agreed to testify at the joint trial of his co-defendants, Walker and Hope. In addition to Brown's testimony, the State presented the testimony of numerous police officers who had participated in the investigation of the Worth County automobile theft, the Perry carjacking, and the apprehension of the co-defendants; the elderly victims of the Perry carjacking; two witnesses to that carjacking; the man approached by Walker after that carjacking and asked for a ride to the hospital, who identified Walker at trial; the Michigan car salesman who copied Walker's driver's license, allowed him to test drive the Mountaineer, and identified Walker at trial; the Michigan woman from whom the men carjacked the Explorer and her grandmother, an eyewitness; the Tennessee car salesman whom Walker and Brown had kidnapped during the test drive of the Pathfinder and who, at trial, identified both Walker and Brown, as well as the handgun and the ring Walker was wearing when he arrived at the hospital as the one Walker had stolen from him; and various family members of Hope and Brown, who testified that, after the three men returned from their out-of-state trip, they had unfamiliar vehicles, specifically, an Explorer, a Pathfinder, and a Mountaineer.

The State's final witness was a police officer who had videotaped a custodial statement given by Hope shortly after his arrest. The State redacted the videotape to remove any direct references to Walker, but, before the State was able to play the entire videotape for the jury, Hope entered a negotiated guilty plea to the charges. The State then rested its case without playing the remainder of the videotape, and the trial court instructed the jury to disregard the videotape in its entirety. The jury ultimately found Walker guilty beyond a reasonable doubt of armed robbery, hijacking a motor vehicle, and kidnapping; the court declared a mistrial on the charge of aggravated assault after the jury was unable to reach a verdict on

that count.[3]

(a) In claiming that the trial court erred in denying his motion for a directed verdict of acquittal on all of the charges, Walker contends that the evidence presented was insufficient because the only evidence identifying him as the perpetrator of the charged crimes was the uncorroborated testimony of an unindicted co-conspirator, Brown. At trial, Walker's defense was based upon an argument that the State presented no evidence to corroborate Brown's testimony that he (Walker) participated in the Perry carjacking of the Cadillac and the kidnapping and armed robbery of the elderly woman. This argument lacks merit.

Although the testimony of a single witness is generally sufficient to establish a fact, in felony cases where the only evidence presented to prove that fact is the testimony of an accomplice, the testimony of the accomplice is not sufficient. OCGA § 24-4-8. The State may meet its burden of proving the fact, however, by presenting additional evidence that corroborates the accomplice's testimony. Id. In such a case,

> [t]he credibility of [corroborating] witnesses [is] for the jury to decide, as [is] the sufficiency of the corroborating evidence. The jury [does] not have to find that the corroborating evidence [is] itself sufficient to support the verdict, or that that evidence matche[s] the testimony of the accomplice in every detail. Slight evidence identifying [the defendant] as a participant in the criminal act [is] sufficient corroboration [of the accomplice's testimony].

(Citations omitted.) *Mitchell v. State*, 279 Ga. 158, 159 (1) (611 SE2d 15) (2005). See also *Swinney v. State*, 217 Ga. App. 657, 658 (1) (458 SE2d 686) (1995) ("Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is all that is necessary to corroborate the testimony of an accomplice.") (citation omitted).

In this case, as shown above, the State presented the testimony of numerous witnesses and other evidence that sufficiently corroborated Brown's testimony about Walker's participation in the indicted crimes. The State showed that a man was approached by Walker on the night of the carjacking and that, at that time, Walker was seriously injured, bloody and limping and was not wearing a shirt or shoes. Although Walker left before the man could get help for him, he

---

[3] The trial court also granted Walker's motion for a directed verdict of acquittal on the charge of theft by receiving stolen property.

was tracked by police bloodhounds and discovered near a buried stash of jewelry that had been stolen from the kidnapped elderly woman. Further, a sandal, a glove and a handgun were discovered on the road in the area where Brown testified that Walker jumped from the Cadillac and the elderly woman testified that the man in the back seat jumped from her car. A matching sandal and a glove were also discovered inside the Cadillac. In addition, as explained further in Division 4, infra, evidence of the three men's multi-state crime spree in the preceding days showed that Walker had helped Hope and Brown plan and commit similar and/or interrelated crimes and that, at the time he was apprehended, Walker was wearing a ring that was stolen during the Tennessee carjacking, kidnapping and armed robbery.

Accordingly, we conclude that the State presented sufficient evidence to corroborate Brown's testimony and for the jury to find beyond a reasonable doubt that Walker committed the crimes for which he was convicted.

(b) Walker also claims that the evidence that implicated him was purely circumstantial and that the State failed to present sufficient evidence to exclude the possibility that he was not the man who committed the charged crimes, but was, instead, an innocent man who had been hit by a car on the interstate and seriously injured.

"To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-4-6.

> In order to support a conviction, [however,] circumstantial evidence does not have to exclude *every* possible hypothesis other than the defendant's guilt, but only *reasonable* hypotheses. Whether a hypothesis is reasonable is a question for the jury, and such finding will not be disturbed on appeal unless the guilty verdict is insupportable as a matter of law.

(Citations omitted; emphasis in original.) *Eberhart v. State*, 241 Ga. App. 164, 165 (1) (526 SE2d 361) (1999). Moreover, "[a] jury is authorized to believe or disbelieve all or any part of the testimony of witnesses, and it serves as the arbiter of conflicts in the evidence before it." (Citation and punctuation omitted.) *Bray v. State*, 294 Ga. App. 562, 563 (1) (669 SE2d 509) (2008).

In this case, as shown above, the State presented sufficient evidence for the jury to find that Walker's alternate hypothesis of innocence was unreasonable under the circumstances. Accordingly, because the jury's verdict is not insupportable as a matter of law, the trial court did not err in denying Walker's motion for a directed

verdict of acquittal. *Eberhart v. State*, 241 Ga. App. at 165 (1).

2. Walker contends that the trial court erred in failing to quash the indictment, arguing that the indictment was invalid because, allegedly, it was returned when the grand jury was not in session. The record shows, however, that, when the grand jury bailiff returned the indictment in open court during regular business hours on January 30, 1998, the grand jury's term had not expired and the grand jury had not been discharged, but that, instead, the members of the grand jury had temporarily recessed and would meet again later in the term. Still, Walker argues that, because the grand jury had not been resummoned by court order and was temporarily absent at the time the bailiff presented it in open court, the indictment was invalid. We disagree.

> While an indictment must be returned into open court[,] it is not ground for quashing an indictment that the indictment is returned by the grand jury bailiff rather than the grand jury itself in the absence of allegations that the bailiff making the return was not the duly qualified officer of the grand jury or that the indictment was tampered with. However, what the grand jurors could not legally do can not be done by the grand-jury bailiff. A grand jury after adjourning or recessing for the night, or for a stated time set by themselves, could return and deliver the indictment to the judge in open court; thus, the bailiff could do the same. After the grand jury is discharged by the court[,] it could do no further act as such body, however, and it follows that the bailiff could not appear to deliver indictments in open court as a substitute for the grand jury after that body had been formally dispersed or adjourned by the court so that it would take an order of court to reconvene it.

(Citations and punctuation omitted.) *Dalton v. State*, 100 Ga. App. 732, 732-733 (2) (112 SE2d 446) (1959). Further, in *State v. Grace*, 263 Ga. 220 (430 SE2d 583) (1993), the Supreme Court of Georgia held as follows:

> A grand jury must be administered an oath, as set forth in OCGA § 15-12-67 (b) and, as that section clearly contemplates, charged generally regarding their duties. We find nothing in our state statutes or constitution which would require that the grand jury be resummoned by court order, resworn and recharged each time they reconvene during a term to conduct business. . . . [G]rand jurors, like any sworn officials, elected or otherwise, are presumed to remember

> their oaths on return from any break in the performance of
> their duties. Accordingly, we hold that a grand jury properly
> summoned, sworn, and charged to serve during a particular
> term of the court, may recess and reconvene as it sees fit to
> conduct its business in the course of that term, and need not
> be resworn or recharged by the court during that term.

(Citation and footnotes omitted.) Id. at 221.

Thus, under the circumstances presented here, Walker has failed to show that the trial court erred in failing to quash the indictment. *State v. Grace*, 263 Ga. at 221; see *Dalton v. State*, 100 Ga. App. at 733 (2) ("Where the contrary does not affirmatively appear [in the record,] it is always to be presumed on appeal, to uphold the validity of the processes of the trial court, that that which was necessary to be done in order to retain jurisdiction of the subject matter has been done.") (citations omitted).

3. Walker argues that the trial court erred in denying his motion to sever because evidence of a similar transaction that involved his co-defendant, but not him, was introduced at trial. According to Walker, because that similar transaction was "closely related" to the indicted offenses, it implicated him in the indicted offenses. Walker claims that severing the trial would have prevented this "contamination."

The crimes to which Walker refers on appeal, however, were not similar transactions at all, but were, instead, the very crimes for which he was indicted and tried, i.e., the Perry carjacking of the Cadillac and the armed robbery and kidnapping of the elderly woman. Accordingly, this alleged error is without merit.

4. Walker contends that the trial court erred in admitting similar transaction evidence, arguing that he was never identified as the perpetrator of the similar transactions and that the similar transactions were insufficiently similar to the charges for which he was being tried. Pretermitting whether the separate crimes that Walker refers to were, in fact, admissible as similar transactions or were, instead, admissible as part of the res gestae of the Perry carjacking,[4] we find no error.

> In general, evidence of independent offenses committed by
> a defendant is irrelevant and inadmissible in a trial for a
> different crime. In some cases, however, evidence of similar
> crimes (or transactions) is admissible where its relevance to

---

[4] Notably, the State argued that the offenses were not really similar transactions, but were part of the same criminal enterprise, crime wave, or sequence of events immediately preceding the Perry carjacking and, thus, were admissible as res gestae evidence.

show identity, motive, plan, scheme, bent of mind and course of conduct, outweighs its prejudicial impact. Before evidence of prior crimes is admissible, the trial court must determine that the State has affirmatively shown that: (1) the State seeks to admit evidence of the independent offenses or acts for an appropriate purpose; (2) there is sufficient evidence that the accused committed the independent offenses or acts; and (3) there is sufficient connection or similarity between the independent offenses or acts and the crimes charged so that proof of the former tends to prove the latter.

(Citations and punctuation omitted.) *Pareja v. State*, 286 Ga. 117, 119 (686 SE2d 232) (2009). Before admitting similar transaction evidence, the trial court must hold a hearing where the State bears the burden of showing that the evidence of similar transactions is admissible under the three-prong test. *Myers v. State*, 256 Ga. App. 135, 141-142 (3) (567 SE2d 742) (2002); Uniform Superior Court Rule 31.3 (B).

When reviewing the trial court's factual findings regarding whether the State satisfied the three-prong test, we apply the clearly erroneous standard. Further, the decision to admit similar transaction evidence which satisfies the three-prong test is within the trial court's discretion and will not be disturbed absent an abuse of that discretion.

(Citations omitted.) *Flowers v. State*, 269 Ga. App. 443, 444 (1) (604 SE2d 285) (2004).

(a) Walker's claim that he was not identified as the actual perpetrator in each of the similar transactions is not supported by the evidence presented, which showed that Walker was either the actual perpetrator or a party to the crimes.

Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime. . . . A person is concerned in the commission of a crime only if he: (1) [d]irectly commits the crime; (2) [i]ntentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity; (3) [i]ntentionally aids or abets in the commission of the crime; or (4) [i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime.

OCGA § 16-2-20.[5] If the defendant is not the actual perpetrator of the crime, his mere presence at the scene of the crime is not sufficient evidence to establish that he was a party to the crime. *Pruitt v. State*, 282 Ga. 30, 32 (1) (644 SE2d 837) (2007). Instead, the State must show that the defendant shared a common criminal intent with the actual perpetrator, a fact which the jury may infer from evidence of the defendant's conduct before, during, and after the crimes. Id.

As shown above, the evidence presented showed that Walker was involved in the planning and/or execution of each of the similar transactions, even if he was not the actual perpetrator of the crime. From the moment Walker, Hope and Brown decided to travel to Michigan to pick up Walker's settlement check, the three men acted in concert to accomplish a quick succession of common criminal pursuits. The evidence also showed that, after each of the crimes, Walker shared in the proceeds from the crimes by using the vehicles, money, and credit cards obtained for his personal benefit, such as transportation, food and lodging for him, his girlfriend and their infant. He also benefitted from the proceeds that were used to sustain and perpetuate the common criminal enterprise he shared with Hope and Brown, an enterprise that used the proceeds to buy the gas and handguns needed for the commission of subsequent crimes, from which he and his co-conspirators further benefitted. Given that Walker was identified as an active participant in individual crimes that were part of this continuing criminal enterprise, not just by Brown but also by other witnesses, and that Walker's possession of the ring stolen from the Tennessee car salesman further demonstrated his involvement in the crime spree, the jury was authorized to find that he committed the independent offenses or acts as either an actual perpetrator or as a party to the crimes.

(b) Walker also contends that some of the similar transactions were insufficiently similar to the indicted crimes to be admissible as similar transactions.

> The law, however, does not require that a similar transaction crime be identical to the crime charged. There can be a substantial variation of circumstances where there exists a logical connection between crimes which are essentially dissimilar. The issue of admissibility of extrinsic transactions has never been one of mere similarity. It is, rather, relevance to the issues in the trial of the case. The State may only have the burden of showing a *logical connection* between crimes which are essentially dissimilar.

---

[5] The court charged the jury on parties to a crime.

(Citation, punctuation and footnote omitted; emphasis in original.) *Sweeder v. State*, 246 Ga. App. 557, 559-560 (2) (541 SE2d 414) (2000). See also *Lampkin v. State*, 277 Ga. App. 237, 239 (626 SE2d 199) (2006) (In order for a similar transaction to be admissible, "the State must demonstrate a sufficient connection *or* similarity between the independent offense or act and the crime charged so that proof of the former tends to prove the latter.") (punctuation and footnote omitted; emphasis in original).

As shown above, the evidence presented in this case shows that some of the offenses committed during the co-conspirators' four-day, multi-state crime spree were, in fact, very similar to the indicted crimes and, therefore, relevant and admissible to demonstrate the co-conspirators' modus operandi, identity, bent of mind, and motive. See *Williams v. State*, 261 Ga. 640, 642 (2) (b), n. 2 (409 SE2d 649) (1991) (listing some of the proper purposes for which an independent offense may be admitted). Even if some of the separate offenses were insufficiently similar to the indicted offenses, though, the evidence showed that each of the offenses was an essential part of a continuing criminal enterprise in which Walker, Hope and Brown acted in concert and with a common purpose. The evidence also showed that these offenses were mutually dependent in that the men used the proceeds from the crimes to strengthen and perpetuate the enterprise. From this perspective, therefore, it is not unreasonable to conclude that the similar transactions were logically connected to, and, in fact, provided the motive for, the Perry carjacking, which, if successful, would have yielded proceeds that the men could have used to disguise the previously stolen vehicles and, thus, to hide their involvement in those thefts, as well as the kidnappings and armed robberies that accompanied some of them.

Accordingly, the trial court did not err in finding that the similar transaction evidence was relevant and admissible in this case. *Williams v. State*, 261 Ga. at 642 (2) (b); *Sweeder v. State*, 246 Ga. App. at 559-560 (2).

*Judgment affirmed. Miller, P. J., and Doyle, J., concur.*

DECIDED JUNE 22, 2011.

*David G. Daniell*, for appellant.

*T. Rabb Wilkerson III, District Attorney, Venita S. McCoy, Assistant District Attorney*, for appellee.