A11A2121. THE STATE v. BROWN.
(726 SE2d 764)

MIKELL, Presiding Judge.

The State of Georgia appeals the grant of Dwight Brown's motion in abatement which quashed the indictment against him because it was not returned in "open court." Finding no error, we affirm.[1]

On January 6, 2011, a Cobb County grand jury returned an indictment against Dwight Brown in a courtroom in the recently constructed Cobb County Courthouse (the "Courthouse"). At the time the indictment was returned, the Courthouse had limited accessibil-

---

[7] Because I do not agree with all that is said, this opinion is physical precedent only. Court of Appeals Rule 33 (a).

[1] Brown filed a motion to dismiss appeal as moot. The motion is denied.

ity to the public while court employees were moving into it. As a result of this limited access, Brown filed a motion in abatement contending that the indictment was defective because it was not returned in open court. Following an evidentiary hearing, the trial court granted Dwight Brown's motion and quashed the indictment, holding that the indictment was fatally defective because it was not returned in open court.

At the time the indictment was returned, every exterior doorway was locked and the only entrance available to the public was a walkway, guarded by deputies, connecting the old and the new courthouses. The deputies were stationed there to ensure the integrity of the clerk's office files being transferred to the new building and as a security measure because some construction workers in the Courthouse were using knives and hammers to install carpeting.

J. Cameron Tribble, an attorney at the firm representing Brown, went to the Courthouse to observe the return of the indictment against Brown. Tribble found the doors to the Courthouse either locked or guarded by sheriff's deputies. To gain entry to the Courthouse, he was instructed to call the court administrator and obtain a personal escort across the walkway to the courtroom. He did so, and it took several minutes for the court administrator to meet him so that he might be escorted into the Courthouse. By the time Tribble was finally able to enter the courtroom, he had missed the return of Brown's indictment. The presiding judge testified that he did not intend to exclude anyone from the courtroom and that the media and sheriff's department personnel were present in the courtroom. Tribble was delayed approximately ten to fifteen minutes because he could not enter the front entrance of the Courthouse.

Following an evidentiary hearing on Brown's motion in abatement, the trial court found that because Tribble was "delayed and impaired from reaching [the courtroom]," the indictment was not returned in open court. Accordingly, the trial court granted the motion in abatement and quashed his indictment. The state appeals, arguing that there is no requirement that an indictment be returned in open court; that the indictment was returned in open court; and if the indictment were found to be not returned in open court, such error was harmless because there was no prejudice to the defendant.

The state argues that there is no law requiring an indictment to be returned in open court because neither the United States Constitution nor the Constitution of the State of Georgia addresses this issue. However, Georgia case law has long held that an indictment

must be returned in open court to be valid.[2] This requirement "must be complied with in every case,"[3] and failure to comply strictly with this rule may nullify an otherwise valid indictment.[4] This court has held that to satisfy the "in open court" requirement, the "place of the reception of the indictment must be one where the court is being held open to the public."[5] The rationale behind "surrounding the return of an indictment with formalities and requiring that it be returned in open court is to prevent the administration of criminal laws taking on the aspect of 'star-chamber' proceedings."[6] Further, our Supreme Court has explained that were the "in open court" rule otherwise, "it would render it possible for a designing or revengeful foreman of a grand jury to ruin any citizen by surreptitiously filing with the clerk in his office an indictment manufactured by himself alone, upon which his fellow jurors had taken no action."[7]

The state notes that *Zugar v. State*, which stands for the premise that an indictment must be returned in open court pursuant to the Fifth Amendment, relied upon a federal case that has since been abrogated.[8] Despite any abrogation at the federal level, however, our Supreme Court has not abrogated this rule, and we are bound to follow the decisions of our Supreme Court.[9]

In this case, the Courthouse had limited accessibility at the time the indictment was returned against Brown: the exterior doors were locked, the only entrance to the Courthouse — the catwalk — was guarded by deputies, and Tribble was required to call the court administrator in order to be escorted to the courtroom. Tribble was thereby delayed by approximately ten to fifteen minutes in reaching the courtroom, and, as a result, was not present when the indictment

---

[2] *Zugar v. State*, 194 Ga. 285, 289-290 (21 SE2d 647) (1942); *Sampson v. State*, 124 Ga. 776 (53 SE 332) (1906); *Clinkscales v. State*, 102 Ga. App. 670, 672 (1) (117 SE2d 229) (1960); *Walker v. State*, 310 Ga. App. 223, 230 (2) (713 SE2d 413) (2011).

[3] (Citations omitted.) *Cadle v. State*, 101 Ga. App. 175, 180 (1) (113 SE2d 180) (1960).

[4] Id. at 181 (1). Accord *Zugar*, supra at 288.

[5] (Citation omitted.) *Cadle*, supra. Accord *Zugar*, supra at 290 (finding that returning an indictment "in open court" requires "the personal appearance of the grand jury in the courtroom or the place where court was being held *open to the public* with the judge and clerk present") (emphasis supplied).

[6] (Citation omitted.) *Clinkscales*, supra at 673 (1). Accord *Zugar*, supra at 290 (rebuffing the idea that "technicalities and formalism" surrounding the return of an indictment serve no good purpose and must be put aside and finding that they serve to protect "the freedom, the liberty, and the dignity of men").

[7] (Citation and punctuation omitted.) *Sampson*, supra at 779.

[8] See *Renigar v. United States*, 172 F. 646 (4th Cir. 1909), abrogation recognized by *United States v. Lennick*, 18 F3d 814 (9th Cir. 1994).

[9] *Nahid v. State*, 276 Ga. App. 687, 688 (3) (624 SE2d 264) (2005).

was returned. Because of these factors, we find that the courtroom was not open to the public at that time.

Contrary to appellant's arguments, the fact that other members of the public, including members of the media, were in the courtroom does not mean that the indictment was returned "in open court" for purpose of this analysis. In *Cadle*, the fact that a number of people, including defendant's attorneys, were present at the time an indictment was returned in the presiding judge's chambers adjacent to the courtroom, and not in the courtroom itself, did not alter this Court's conclusion that the indictment was not returned in open court.[10]

Further, appellant's argument that Brown has not alleged any prejudice or injury and, accordingly, any error by the trial court is merely harmless error, is meritless. The Supreme Court of Georgia has held that any failure to return the indictment in open court "is per se injurious to the defendant."[11] None of the cases cited by appellant[12] involve the abandonment of the formalities surrounding the return of the indictment, and thus are inapposite to the case at hand.

Thus, under the circumstances presented here, appellant has failed to show that the trial court erred in granting the motion in abatement and quashing the indictment.

*Judgment affirmed. Barnes, P. J., Miller and Adams, JJ., concur. Dillard, J., concurs fully and specially. Blackwell and Boggs, JJ., dissent.*

DILLARD, Judge, concurring fully and specially.

I concur fully with the majority opinion and write separately only to further address Judge Boggs's argument that the court in the case sub judice was open and that the majority's holding "will result in challenges to the open-court rule based upon claims by lawyers or members of the public who arrive at the courthouse minutes before they believe an indictment to be returned, only to be briefly detained by courthouse security or a crowded elevator."

It is undoubtedly true that post-September 11, we live in a world of heightened security. But the reality is that such "inconveniences" are to be expected and anticipated and are now, unfortunately, almost as commonplace as the nuisance of a crowded elevator. Nevertheless,

---

[10] *Cadle*, supra at 180 (1).

[11] *Zugar*, supra at 291.

[12] See *Isaacs v. State*, 259 Ga. 717, 720 (2) (b) (386 SE2d 316) (1989) (Any error arising from basing an indictment against defendant on hearsay was harmless because of the jury's verdict of guilty, which demonstrated that there was probable cause to charge defendant with offenses for which he was convicted.) and *Anderson v. State*, 258 Ga. 70 (6) (365 SE2d 421) (1988) (Any error arising from trial court's failure to order prosecution to comply with defendant's timely request for indictment, where indictment was on file in the clerk's office, was harmless.).

these situations can certainly be mitigated to some degree by proper planning and time management. Indeed, as the dissent implies, better planning and time management on the part of Brown's attorney may have been warranted in this case. But ultimately, the punctuality (or lack thereof) of Brown's attorney is beside the point, and does nothing to change the fact that the courthouse in question was not open to the public.

Indeed, the record reflects that Brown's attorney required an escort to gain entry into the courthouse and was informed by the escort that the courthouse was not opening to the public until the following week. Additionally, the court administrator for the Cobb Superior Court testified that the courthouse was scheduled to open "for judges to conduct court in the new building" on January 10, 2010 (four days after the return of the indictment against Brown), and that the main exterior doors of the new courthouse were locked. And anyone who gained access to the new courthouse via the catwalk connecting it from the old courthouse would have passed through a standard security checkpoint for the old courthouse *prior* to reaching the separately guarded catwalk.

As to the specifics of who could access the new courthouse on the day in question, the Sheriff of Cobb County testified that arrangements were made so that "only the presentments" could be received in the new courthouse and that he instructed his staff "to allow anyone that wanted to come into this courtroom, *if they had business in this courtroom*[,] to come, to allow them,"[13] and to provide an escort if necessary. The sheriff further corroborated testimony that the new courthouse was scheduled to officially open—and did officially open— the following week, and that the main entrance to the new courthouse was closed on the day in question, with access limited to use of the guarded catwalk that, again, could be reached *after* passing through an earlier security checkpoint.

The sheriff agreed that a person, after having passed through the initial security checkpoint, could have gone *anywhere else* except the new courthouse without further checks. But upon reaching the catwalk to the new courthouse, a person would have been subjected to an inquiry as to what his or her business was in the new courthouse. And when asked if access would have been granted to a person who failed to articulate what business he or she had in the new courthouse, the sheriff testified that access would have been *denied* to such a person.

---

[13] (Emphasis supplied.)

The sheriff further clarified that the reason for this was due to the presence of construction hammers and knives inside the new courthouse, and the sheriff's desire to limit the number of individuals who did not have "the proper badge and identification." The sheriff went on to admit that he had expressed concerns to courthouse personnel that the new courthouse should not be opened when construction continued, that the push to open the courthouse was "moving too fast," and that he could not allow the public to roam free inside the new courthouse due to the presence of dangerous construction tools. And although he testified that a person would have been admitted to the new courthouse if he or she had "stated that their business was they wanted to watch what was going on in the courtroom on January 6th," the fact nevertheless remains that access to the new courthouse was limited and not available to the general public in the absence of having special knowledge and uttering the right "magic" words—which were *not* required to observe proceedings at the old courthouse.[14] Thus, this presents a much different situation than that of temporary delay by using a crowded elevator or passing through metal detectors.

In short, however responsible the security measures to limit access to the new courthouse due to the presence of construction tools, the decision to conduct grand jury presentments under circumstances of such limited access directly contradicts our Supreme Court's acknowledgment that "[i]t is a fundamental part of our judicial system that the *general public* be permitted to witness court proceedings sufficiently to guarantee that there may never be practiced in this State secret or star-chamber court proceedings, the deliberations of the juries alone excepted."[15] Additionally, our Supreme Court has noted that public officials "are made conscious of the duty to faithfully perform official acts when they are acting in the presence of the general public; and this fact causes the public to have confidence in the officials, and hence confidence in the governmental

---

[14] In this regard, we are unconvinced that the presence of some members of the media leads to a conclusion that the new courthouse was "open." Indeed, a local reporter testified that he had been made aware that a presentment would be returned on the day in question, that he was escorted across the catwalk by the district attorney, that other members of the media knew about the indictment because he passed word through his assignment desk, and that he had a press pass to gain access into the courthouse.

[15] *Zugar v. State*, 194 Ga. 285, 289 (21 SE2d 647) (1942) (emphasis supplied); *see also Cadle v. State*, 101 Ga. App. 175, 180 (1) (113 SE2d 180) (1960) ("The judge is the court for the reception of indictments only when he is presiding in *open court*. There must be a judge presiding, the clerk must be present, and the place of the reception of the indictment must be one where the court is being held open to the public.").

departments where such officials serve."[16] And here, the simple solution to comply with the open-court requirement was to conduct the grand jury presentments in the old courthouse—which was undoubtedly and undisputedly open to the general public without inquisition, subject only to standard security measures—for one additional week.

Accordingly, I concur fully with the majority opinion.

BLACKWELL, Judge, dissenting.

I respectfully dissent. The court below concluded that the indictment in this case was not returned in a court proceeding open to the public simply because lawyer J. Cameron Tribble did not make it to the courtroom in time to observe the return. The court found that Tribble did not arrive soon enough because he was held up at a security checkpoint until someone arrived to escort him to the courtroom. And the court reasoned that the failure of an escort to appear "without any delay whatsoever" effectively closed the court proceedings that Tribble sought to observe. The court below, I think, applied an incorrect legal standard in assessing whether the delay at the security checkpoint effectively closed the court to the public, and for that reason, I would vacate the judgment below and remand for the court to apply the correct legal standard and reconsider whether the indictment was returned in open court.

When a citizen comes to the courthouse to observe a court proceeding, he may encounter some delay along the way. That delay might be occasioned by a congested security checkpoint, a crowded elevator, an absence of signs clearly identifying the way to the courtroom, misinformation about the particular courtroom in which a proceeding is to be held, or any number of other inconvenient circumstances. As Judge Boggs correctly notes in his dissent,[17] not every delay amounts to a closure of the court. Only when a citizen is *unreasonably* prevented by courthouse officials from attending a court proceeding — either because his admission to the courtroom is unreasonably refused altogether, unreasonably delayed for a time, or

---

[16] *Zugar*, 194 Ga. at 290; *see also Blevins v. State*, 220 Ga. 720, 725-26 (4) (141 SE2d 426) (1965) (applying the reasoning in *Zugar v. State* to hold that "the requirement that juries must be drawn in open court . . . is procedure which enables the public to observe the conduct of the judge in drawing juries and thus prevent any possible corruption or suspicion of corruption in this vital part of our jury system").

[17] I agree with much of what Judge Boggs has to say, but I do not join his dissent because, as I understand it, he would conclude as a matter of law that the court was open to the public and reverse the judgment below. I think that determination ought to be made by the court below, applying the correct legal standard.

otherwise unreasonably hindered — can it be said that the proceeding is closed to the public. See *Purvis v. State*, 288 Ga. 865, 868 (708 SE2d 283) (2011) (holding, with respect to right of public to attend criminal trials, that court has obligation "to take *reasonable* measures to accommodate public attendance") (emphasis supplied).

The court below made no finding about whether the delay that Tribble encountered was unreasonable, presumably because, as I understand its order, it found "any delay whatsoever" unacceptable.[18] This reflects the application of an incorrect legal standard. The court below also made no findings about many of the circumstances that may prove to be important in assessing the reasonableness of the delay, including, for instance, whether it was reasonable for the Sheriff to require that citizens generally, and Tribble specifically, have an escort, for how long Tribble was delayed by the need to await an escort, whether the escort reasonably should have arrived sooner, and whether Tribble would have made it to the courtroom soon enough to observe the return of the indictment, even with the more prompt arrival of an escort. With so many unanswered questions,[19] I cannot say as a matter of law that the indictment was not returned in a proceeding open to the public,[20] notwithstanding that I have serious

---

[18] The court said that "[i]f Mr. Tribble was required to have been escorted to the courtroom for reasons of safety or security, then the escort should have been provided *without any delay whatsoever*." (Emphasis supplied.)

[19] The majority makes its own factual finding that Tribble was "delayed by approximately ten to fifteen minutes in reaching the courtroom" as a result of his having to wait for an escort. I do not think the record is so clear that we, as appellate judges, can make such a finding. Tribble testified that he telephoned the court administrator for an escort at 3:33 p.m. and that he eventually arrived in the courtroom between 3:45 and 3:52 p.m. The court administrator said that he needed about five minutes to reach the security checkpoint in the old courthouse so that he could escort Tribble to the courtroom, in part because the elevators were being tested at the time. That is the only evidence concerning the length of the delay. Even assuming that Tribble did not arrive in the courthouse until 3:52 p.m., not all of the nineteen minutes following his call to the court administrator can be fairly attributed to his having to await the escort. Surely it would have taken him several minutes, even after the escort arrived, to cross from the old courthouse to the new courthouse, go to the elevator bank, wait for an elevator, ride an elevator to another floor, and walk to the courtroom in which indictments were being returned. I cannot say from the existing record that "ten to fifteen minutes" was spent awaiting an escort, and I do not understand how the majority can make such a finding on this record. I would leave such fact-finding to the trial judge, who, unlike us, has worked in both the old and new courthouses in Cobb County and presumably is much more familiar with the layout of the courthouses. In any event, even if the majority is right, I cannot say as a matter of law that a "ten to fifteen" minute delay is unreasonable.

[20] In his special concurrence, Judge Dillard expresses concern about citizens being asked about their reasons for visiting the courthouse before they are admitted, and I share that concern, although I do not think it necessarily is dispositive in this case. Such an inquiry is a circumstance that a trial judge properly can consider in assessing whether security procedures unreasonably hindered a citizen from attending a court proceeding. I do not think, however, that a court proceeding is closed to the public just because such an inquiry is made. A sheriff properly can, I think, inquire about whether someone has legitimate business in the courthouse

doubts that it was. Consequently, I would vacate the decision of the court below and remand for that court to make the appropriate findings and reconsider whether the indictment was returned in open court, applying the correct legal standard. Because the majority does not, I respectfully dissent.

BOGGS, Judge, dissenting.

Because this record shows that the indictment was returned in open court, I respectfully dissent.

The majority's holding on the subject of public judicial proceedings is misplaced under the facts presented in this case. Although access to the courthouse was limited and required the assistance of court personnel, it was not prohibited. Other members of the public and members of the media were present in the courtroom, which demonstrates beyond dispute that the courtroom was indeed open to the public. A partner in the firm representing Brown instructed Tribble, an associate of the firm representing Brown who explained that he did "mostly civil practice," to attend the reading of the indictment. Both Tribble and the partner were aware of the limited access at the courthouse that day, yet Tribble left his law office at 3:25 p.m., only 35 minutes before he believed that the indictment would be returned. Tribble testified that the courtroom was unlocked, no one stopped him at the door to the courtroom, and other people were present in the courtroom.

As explained in *Zugar v. State*, 194 Ga. 285 (21 SE2d 647) (1942),[21] "[i]t is a fundamental part of our judicial system that the general public be permitted to witness court proceedings sufficiently to guarantee that there may never be practiced in this State secret or star-chamber court proceedings." Id. at 289. The proceedings here were not "secret or star-chamber court proceedings." The face of the indictment signed by the jury foreperson and bailiff shows that it was returned in open court, and the defendant has come forth with no evidence showing otherwise. The majority's holding here will result in challenges to the open-court rule based upon claims by lawyers or members of the public who arrive at the courthouse minutes before

---

before admitting them, so long as the sheriff understands that attending and observing court proceedings is the legitimate business of the public, and so long as the manner of inquiry does not unreasonably hinder the public from attending such proceedings. Here, the Sheriff of Cobb County testified that, if a member of the public had asked for admission to the new courthouse to attend and observe court proceedings, he would have been admitted, albeit with an escort.

[21] We note that *Zugar* relied in part on *Renigar v. United States*, 172 F. 646 (4th Cir. 1909), which was later abrogated by the United States Supreme Court as stated in *Phifer v. United States*, 2008 U. S. Dist. LEXIS 97281 (II) (3) (W.D. N. C. 2008) (errors in grand jury presentment process subject to harmless error analysis).

they believe an indictment is to be returned, only to be briefly detained by courthouse security or a crowded elevator.

Both of the cases cited by the majority are inapposite. In *Cadle v. State*, 101 Ga. App. 175 (113 SE2d 180) (1960), the judge received the indictment from the bailiff in the presence of the clerk in a room that served as the office of the presiding judge. Id. at 180 (1). Although the door was open between that room and an outer room occupied by members of the public and one of the attorneys for the defendant, the court held that "the evidence relied upon to show that the court was at that time and place being *held open* to the public is, to say the least, doubtful and uncertain." (Emphasis in original.) Id. In *Zugar*, supra, the bailiff delivered an indictment to the clerk of court in the absence of the judge. Id. at 287-288. Neither of these circumstances is present here.

DECIDED MARCH 29, 2012 — 

*Patrick H. Head, District Attorney, John C. Butters, Assistant District Attorney, Bondurant, Mixson & Elmore, John E. Floyd*, for appellant.

*Gillen, Withers & Lake, Craig A. Gillen, The Barnes Law Group, Roy E. Barnes, John F. Salter, Jr.*, for appellee.