S12G1305. THE STATE v. BROWN.

(748 SE2d 376)

BENHAM, Justice.

This appeal is from the grant of a petition for a writ of certiorari. On January 6, 2011, a Cobb County grand jury returned an indictment against appellee Dwight Brown in Judge George Kreeger's courtroom in the newly constructed Cobb County courthouse. Appellee filed a motion in abatement alleging the indictment was not returned in open court. Upon holding a hearing on the motion, the trial court agreed with appellee and quashed the indictment. The State appealed the trial court's ruling and the Court of Appeals affirmed. *State v. Brown*, 315 Ga. App. 282 (726 SE2d 764) (2012). We granted the State's petition for certiorari, posing the following question to the parties: "Did the Court of Appeals err in affirming the dismissal of Brown's indictment on the ground that the indictment had not been returned in open court?" For reasons that follow, we affirm.

1. For over a century the rule in Georgia has been that a grand jury indictment must be returned "into open court." See *Sampson v. State*, 124 Ga. 776 (53 SE 332) (1906). See also *Zugar v. State*, 194 Ga. 285, 288 (21 SE2d 647) (1942); *Barlow v. State*, 127 Ga. 58 (56 SE 131) (1906); *Sellars v. State*, 113 Ga. App. 510 (1) (149 SE2d 158) (1966); *Clinkscales v. State*, 102 Ga. App. 670, 673 (117 SE2d 229) (1960); *Cadle v. State*, 101 Ga. App. 175 (113 SE2d 180) (1960).

It is a fundamental part of our judicial system that the general public be permitted to witness court proceedings

sufficiently to guarantee that there may never be practiced in this State secret or star-chamber court proceedings, the deliberations of the juries alone excepted.

*Zugar*, 194 Ga. at 289-290. The term "open court," as far as returning the indictment is concerned, means that the indictment is returned in a "place where court [is] being held open to the public with the judge and the clerk present." Id. at 289. See also *Cadle*, 101 Ga. App. at 180 ("the place of the reception of the indictment must be one where the court is being held open to the public."). A failure to return the indictment in open court is per se injurious to the defendant. *Zugar*, 194 Ga. at 291.

At the hearing on the motion in abatement, several witnesses testified that the new courthouse was not scheduled to be open to the public for the purpose of conducting the court's business until January 10, 2011. A deputy clerk testified that she did not schedule any trials or other calendar matters to occur in the new courthouse prior to January 10. Judge Kreeger testified that, although his office had moved to the new courthouse two days after Christmas, during the week of January 6 he was conducting his courtroom proceedings in the old courthouse. On January 6, however, Judge Kreeger wanted the grand jury presentments to occur in his new courtroom so that the grand jury could see the new courthouse on its last day of convening. The county sheriff testified that his main concern about allowing people into the new courthouse prior to January 10 was safety and security, especially since construction was still ongoing in the new courthouse and equipment and tools were lying about the premises. As a result, the sheriff posted deputies in the breezeway connecting the old and new courthouses. The front entrance to the new courthouse on Haynes Street (Haynes Street entrance) was locked because there were no security personnel to post there as of January 6. Thus, on that date, anyone who wanted to access Judge Kreeger's courtroom in the new courthouse had to go through security in the old courthouse and cross over the breezeway to where the deputies were posted at the entrance to the new courthouse. The sheriff stated he did not want anyone in the new courthouse without "proper badge and identification." He confirmed that anyone wanting to enter the new courthouse was required by the sheriff's office to state his/her business and anyone who could not articulate his/her business for being there would not be allowed into the new courthouse. The sheriff agreed that on January 6, the new courthouse was the only building in the judicial complex that could not be entered into without further inquiry after having gone through the regular security checkpoint in the old courthouse.

Four other witnesses testified about their experiences in accessing the new courthouse during the week of January 6. Attorney Thomas Jennings Browning testified that he went to the judicial complex on January 3 to pick up an order from one of the judges. When he approached the deputies posted at the breezeway entrance to the new courthouse, he was not allowed to go inside. He came back a day or two later and was informed that he would have to contact the court administrator in order to gain entry into the new courthouse. Attorney Cameron Tribble, who was one of appellee's attorneys, testified he went to the new courthouse on January 6 specifically to see the return of the indictment against appellee. Attorney Tribble went to the Haynes Street entrance, but the door was locked and he saw signs that said the new courthouse was not yet opened. Attorney Tribble then contacted his boss, Attorney Roy Barnes, who instructed Attorney Tribble to contact the court administrator for assistance. When Attorney Tribble met the court administrator at the atrium in the old courthouse, there was a reporter who was also trying to gain access to the new courthouse. The court administrator escorted Attorney Tribble and the reporter past the deputies into the new courthouse and then the district attorney escorted them the rest of the way to Judge Kreeger's courtroom. By the time Attorney Tribble made it into the new courthouse and arrived at the courtroom, however, the grand jury had already returned the indictment against appellee. Attorney John Salter, another attorney for appellee, attempted to go to the new courthouse on January 6 to find the district attorney in order for him to sign a bond agreement for appellee. The deputies at the breezeway entrance would not allow Mr. Salter to enter the new courthouse despite the fact that he had stated his business with the district attorney. Mr. Salter then went to the district attorney's office in another building of the judicial complex in order to wait for the district attorney there. After waiting in the district attorney's office 15 to 20 minutes, an employee in the district attorney's office escorted Attorney Salter to the new courthouse where he found the district attorney and was able to conduct his business concerning appellee's bond. Attorney Salter stated that his understanding was that the only way to gain entry into the new courthouse on that day was to be escorted by someone from the clerk's office or by someone from the district attorney's office. Finally, a television news reporter testified he used his press pass to gain entry to the old courthouse on January 6. While he was standing in the atrium of the old courthouse trying to figure out where the return of appellee's indictment would be, he saw the district attorney and the district attorney escorted him into the new courthouse.

Under the factual circumstances of this case, we cannot say that on January 6, 2011, appellee's indictment was returned in a place that was open to the public. All court personnel and the sheriff testified that the new courthouse was not scheduled to be opened for the court's regular business until January 10. Judge Kreeger was not conducting his proceedings in the new courthouse that week, but only had the grand jury presentments therein because he wanted to show the grand jury the new courthouse on their last day. The persons who were able to access the new courthouse on January 6 were attorneys and members of the media who had a relationship with court personnel or were knowledgeable enough to obtain an escort from the clerk's office or the district attorney's office. On January 6, the average member of the public who simply wanted to observe the return of the indictment in Judge Kreeger's new courtroom would not have had such relationships or knowledge. Rather, a member of the public would have found the Haynes Street entrance locked with no instruction on how to gain entry and, if a member of the public was able to make his/her way to the breezeway entrance via the old courthouse, he or she likely would have been turned away by the deputies posted there much like Attorney Browning and Attorney Salter. Thus, as the trial court and the Court of Appeals correctly concluded, the indictment was not returned in a place open to the general public as required by *Zugar* and its progeny.

2. The State does not dispute the facts of the case, but rather requests the Court to overrule *Zugar* because the State contends the case has been abrogated by federal law such that the per se injurious rule announced in *Zugar* should be substituted with a harmless error test. In support of its argument that *Zugar* has been abrogated, the State cites *United States v. Lennick*, 18 F3d 814 (9th Cir. 1994) which abrogated *Renigar v. United States*, 172 F. 646 (4th Cir. 1909), a case this Court cited in *Zugar*. We are not persuaded by the State's argument. The decision in *Lennick*, which was interpreting Rule 6 of the Federal Rules of Criminal Procedure, is not binding on Georgia's courts. See *Greer v. Thompson*, 281 Ga. 419, 421 (637 SE2d 698) (2006); *Tanner v. State*, 242 Ga. 437 (1) (249 SE2d 238) (1978).[1] Indeed, "Georgia law . . . regarding the public aspect of hearings in criminal cases is more protective of the concept of open courtrooms than federal law." *R.W. Page Corp. v. Lumpkin*, 249 Ga. 576 (3) (292 SE2d 815) (1982). See also *Purvis v. State*, 288 Ga. 865, 866 (1) (708

---

[1] Likewise the State's citation to *Bank of Nova Scotia v. United States*, 487 U. S. 250 (108 SCt 2369, 101 LE2d 228) (1988) is inapposite because that case did not challenge the indictment on the basis that it was not returned in open court.

SE2d 283) (2011). In light of the historical precedent of returning indictments in open court and this state's policy of protecting the openness of our courts, the State has failed to present any basis for adopting a harmless error standard when an indictment is not returned in open court. Therefore, we decline the State's invitation to overrule *Zugar* and its progeny.

Judgment affirmed. *Thompson, C. J., Hunstein, Melton, Nahmias, JJ., Judge John J. Goger and Judge Robert Mumford concur. Hines, P. J., not participating. Blackwell, J., disqualified.*

NAHMIAS, Justice, concurring.

I concur fully in the Court's opinion based on the following two understandings about our holding. First, it should be clear that the Court is not holding that *any* barrier or delay that members of the general public face in gaining access to a courtroom to observe the return of an indictment prevents that proceeding from being "open to the public." Instead, consistent with our case law on the related, constitutional right of criminal defendants to a public trial, the question is whether the public was "denied access to the courtroom *without justification*," meaning that the court "failed in its obligation to take *reasonable measures* to accommodate public attendance." *Purvis v. State*, 288 Ga. 865, 867, 868 (708 SE2d 283) (2011) (emphasis added). Or as then-Judge Blackwell put this point in his opinion below:

> Only when a citizen is *unreasonably* prevented by courthouse officials from attending a court proceeding — either because his admission to the courtroom is unreasonably refused altogether, unreasonably delayed for a time, or otherwise unreasonably hindered — can it be said that the proceeding is closed to the public.

*State v. Brown*, 315 Ga. App. 282, 288-289 (726 SE2d 764) (2012) (Blackwell, J., dissenting) (emphasis in original).

This understanding of our holding today is important to ensure that courts are not deterred from adopting and maintaining reasonable measures to provide security, at the exterior of courthouses and as needed for specific interior areas or courtrooms, and also to ensure that reasonable delays occasioned by such things as a broken elevator or a detour during construction are not deemed to have "closed" courts. Thus, we are not endorsing the trial court's suggestion that "any delay whatsoever" may be unacceptable, see id. at 289 & n. 2; instead, we are concluding that the record, viewed as a whole, shows that the various restrictions placed on access to Judge Kreeger's

courtroom in the new and not-yet-officially-opened courthouse at the time the indictment against Brown was returned unreasonably hindered the general public from being able to attend that proceeding. See id. at 285-288 (Dillard, J., concurring).

Second, in light of the focus of the trial court and the Court of Appeals on the delay that one of Brown's lawyers faced as he tried to get to Judge Kreeger's new courtroom, it is important to recognize that, while evidence that a particular person was unreasonably prevented from accessing a courtroom is certainly relevant, see, e.g., *Purvis*, 288 Ga. at 865-866, the ultimate question is whether the court was "being held open to the *public*," not to any particular individual. *Zugar v. State*, 194 Ga. 285, 290 (21 SE2d 647) (1942) (emphasis added). When, as in this case, the evidence indicates that there was ample available seating in the courtroom, if the evidence shows that someone who wanted to attend a proceeding there was unreasonably precluded from doing so, the State may be hard-pressed to explain how the court was open to the public. However, where space in the courtroom is limited in comparison to the number of persons wishing to enter, the court might accord preferential access to certain members of the public, like the victims of the alleged crime and the family of the defendant, see *Purvis*, 288 Ga. at 867; representatives of the news media, see *R. W. Page Corp. v. Lumpkin*, 249 Ga. 576, 580 (292 SE2d 815) (1982); persons who are not disruptive, see id.; or simply those who first got in line to enter. This understanding of our holding today is important to deter challenges to court proceedings where the evidence demonstrates that "the general public [was] permitted to witness court proceedings sufficiently to guarantee that there may never be practiced in this State secret or star-chamber court proceedings," *Zugar*, 194 Ga. at 289, even though a particular individual missed a proceeding because he failed to leave enough time to get through the security line, got confused by the signs in the courthouse, or received mistaken information about which courtroom the proceeding was in.

If the only evidence in this case related to the delay encountered by the hapless young lawyer who was sent to observe Brown's indictment being returned, this would be a hard case. As the Court's opinion recounts, however, and as also discussed in Judge Dillard's concurring opinion below, the evidence relating to that lawyer meshes with substantial other evidence that the court proceeding at issue was not reasonably open to the general public. For that reason, and with the key understandings discussed above, I concur fully in the Court's opinion.

DECIDED SEPTEMBER 9, 2013.

D. Victor Reynolds, District Attorney, John S. Melvin, John C. Butters, Assistant District Attorneys, Bondurant, Mixson & Elmore, John E. Floyd, for appellant.

The Barnes Law Group, Roy E. Barnes, John F. Salter, Jr., James C. Tribble, Gillen, Withers & Lake, Craig A. Gillen, Thomas A. Withers, Anthony C. Lake, for appellee.